# CHICAGO, MILWAUKEE AND ST. PAUL RAILROAD COMPANY v. STATE OF WISCONSIN.

ERROR TO THE SUPREME COURT OF THE STATE OF WISCONSIN.

No. 177.  Argued March 8, 1915.—Decided June 21, 1915.

A State cannot authorize an individual to take salable property from another without pay—it amounts to deprivation of property without due process of law.

An owner's right to his property is protected even though he may not be actually using it, and the State cannot, under the due process clause of the Fourteenth Amendment, compel an owner of property to allow a third party to have free use thereof until such time as a buyer appears.

A state statute that does not purport to be a health measure cannot be sustained as such.

A state statute which is not a reasonable exercise of the police power

and yet operates to take property cannot be justified on the ground that the party whose property it takes may be able to get an increase in the rates obtained for property not taken. The taking of property and a fixed right to compensation must coincide.

While the right of the State to regulate public carriers in the interest of the public is very great, it does not warrant unreasonable interference with the right of management or the taking of the carrier's property without compensation.

The reserved right of altering and amending the charter of a corporation does not confer mere arbitrary power or authorize the taking of the corporation's property without compensation.

The statute of Wisconsin imposing penalties on sleeping car companies if, the lower berth of a sleeping car being occupied, the upper berth was let down before it was actually engaged, is unconstitutional under the due process clause of the Fourteenth Amendment as an arbitrary taking of property without compensation; nor can it be justified as a health measure under the police power of the State or as amendment or alteration of the charter of the corporation under the reserved power of the State in that respect.

152 Wisconsin, 348, reversed.

IN 1911 the State of Wisconsin passed a statute imposing a penalty upon Sleeping Car Companies if,—the lower berth being occupied—the upper berth was let down before it was actually engaged. Suit was brought against the plaintiff in error for the recovery of the statutory penalty, based on the fact that on the night of August 11, 1911, James T. Hall boarded the Company's sleeping car at Portage, Wisconsin. He engaged lower berth, Section 11 and occupied the same, as an intrastate passenger, between Portage, Wisconsin, and Star Lake, Wisconsin. The upper berth of No. 11 was not engaged or occupied, but was let down and kept down during the night by the porter.

The Company answered that its cars, like those of others in the United States, were so arranged as to provide units consisting of lower berths, upper berths, sections, drawing rooms and compartments; that the lower berth and upper berth units are so arranged that when

prepared for occupancy each of said units is a compartment separated from all other space in the car; that the charge for the use of each of said units is fixed by tariffs established by the State of Wisconsin and by the Interstate Commerce Commission respectively. Under the Wisconsin law the rate from Portage to Star Lake was $1.50 for a lower berth, $1.20 for the upper berth, and $2.70 for the section. It was averred and admitted that Hall, while demanding of the defendant's conductor "that the upper berth be put back and kept there, so that he might have the use of the entire section, paid for the use of the lower berth only and did not offer to pay the tariff for the entire section."

The Railroad Company further averred that it operated sleeping cars over its system of more than 7,000 miles of interstate roads, and that the Interstate Commerce Commission had prescribed rates for each of said sleeping car units on trains running to and from the State of Wisconsin. The rate fixed for the upper was 80 per cent. of the charge for the use of the lower; the price for the whole section being the sum of the two rates. No order had been made by the Interstate Commission which prohibits the use of the upper berth while the lower berth is occupied. It was averred that a compliance with the Wisconsin statute would convenience the occupant of the particular lower berth only, and would not add to the comfort or promote the health, safety or convenience of the other occupants of the car, but would injuriously affect passengers occupying lower berths.

The Company insisted that the statute was arbitrary and unreasonable; not designed to accomplish a legitimate public purpose and contrary to natural justice. It claimed that the statute denied to it the equal protection of the laws; took its property without due process of law in violation of the Fourteenth Amendment and attempted to regulate interstate commerce.

There was a hearing before the court without a jury. Some of the averments in the Railroad's answer were admitted to be true. In addition witnesses were sworn whose testimony—admitted over objection—was to the effect that—while the Company had a pecuniary interest in having the upper berth kept down when the lower was occupied yet,—such lowering was necessary to secure the comfort of the occupant of the lower berth and to prevent him or her from being wakened or disturbed if it became necessary to put down the upper berth and arrange it so that it could be occupied by a passenger who had purchased such upper space during the night. The evidence was to the effect that the opening of the curtains, the glare of the light, the noise of lowering the berth, the work of arranging the bedding for the upper berth and securing the holding wires would necessarily inconvenience the man or woman occupying the lower berth; deprive him or her of the privacy to which they were entitled and interrupt the rest and sleep to secure which they had engaged the berth.

There was evidence that an ordinary sleeping car was better ventilated than an ordinary passenger coach, said to be due to the fact that the coach not only carried more passengers but did not have the ventilating appliances in use on sleeping cars.

There was in addition much evidence, admitted over objection, to prove the methods by which and the extent to which sleeping cars were ventilated. It appeared that a car of ordinary size contained about 5,000 cubic feet of air and that, by means of a series of suction ventilators, operated by the movement of the train, the air therein was sucked through openings in the top of the car. The faster the movement the more rapid the suction. By measuring the air escaping through the ventilators, it had been shown that when the train was running at 35 miles an hour the air in the sleeping car was renewed every two minutes. This air was replaced by that coming through doors, end

openings for ventilating purposes, screens or windows as the case might be.  There was also testimony that when the upper berth was down and the curtains closed the air came in and went out of the lower berth through windows, screens, air spaces, and numerous openings between the curtain and the bed.

There was evidence that while the circulation in the lower berth was not so good as that in the aisle, yet the air in the car and in such lower berth was not injurious to health as demonstrated by repeated chemical analyses of samples of air taken from such lower berths, from the aisles and from other portions of the cars.  There was evidence, and contention based on common knowledge, that the letting down of the upper berth did not affect the health or convenience of the occupants of the car or of either berth. This was demonstrated by the absence of injurious effects and the fact that lower berths with the upper berths down had thus been constantly used by travellers since sleeping cars were invented.

There was further evidence that the car in question was arranged substantially like those operated by sleeping car companies throughout the United States.  In all of them the upper berth was regularly put down when the lower was occupied, unless the whole section was engaged by one person.  There was a further contention that this was true in every State in the Union,—no one of which prohibited the letting down of the upper when the lower was occupied.

The court found as a fact—

"That the closing of upper berths in sleeping-cars has very little effect upon the circulation of air in such sleeping-cars when all lower berths are made up and ready for occupancy.

"That the lowering of upper berths does not endanger the lives, health or safety of persons occupying lower berths in sleeping-cars.

"That the closing of the upper berth will be a convenience to the person occupying the berth below the same and will add to the comfort of such person alone and not to that of the public generally.

"That the defendant has a right to charge for the use of the space occupied by the upper berth and that such right is the property of the defendant."

He concluded, as matter of law, that the State was not entitled to recover the penalty and dismissed the complaint. The case was then taken to the Supreme Court of Wisconsin, which (152 Wisconsin, 348) said that "'the trial court held that the evidence showed a compliance with the act would affect the convenience and comfort of the traveling public in but a slight degree,' but that . . . the court's view of the evidence was evidently the result of the court's erroneous idea of what, in the legal sense, is essential to present an occasion or exigency involving the general welfare." The court further said "that in the light of common knowledge the evidence in the case tends to show that the effects of the regulation contribute to the comfort and convenience of the traveling public and thereby contribute to promote their health and general welfare," that the regulating "statute was a legal exercise of the police power;" and that the regulations only incidentally affect interstate commerce. The "law permits berths to be occupied and used when any person desires them and thus the defendant is secured against loss for services it may be able to furnish the public. . . ." It thereupon reversed the judgment of the trial court. The Railroad Company then brought the case here assigning as error that the judgment sustaining the statute deprived it of property without due process of law, interfered with its management of cars and made a discrimination between the privileges accorded state and interstate passengers in the same car at the same time.

*Mr. Frank B. Kellogg,* with whom *Mr. Burton Hanson* and *Mr. Gustavus S. Fernald* were on the brief, for plaintiff in error:

Chapter 272 of the 1911 laws of Wisconsin deprives plaintiff in error of its property without due process of law, and denies to it the equal protection of the laws in taking its property for public use without compensation, and is therefore in violation of the Fourteenth Amendment of the Constitution of the United States.

Chapter 272 of the 1911 laws of Wisconsin is a regulation of commerce among the States, and is void under § 8 of Art. I of the Constitution of the United States.

Numerous authorities of this and other courts support these contentions.

*Mr. Walter Drew,* Deputy Attorney General of the State of Wisconsin, with whom *Mr. W. C. Owen,* Attorney General of the State of Wisconsin, was on the brief, for defendant in error:

The highest court of the State has construed the statute and held it constitutional.

The Wisconsin Upper Berth Law is a legitimate exercise of the police power of the State in behalf of the public health and welfare.

The law does not violate any rights of the plaintiff in error guaranteed by the Fourteenth Amendment nor is it unconstitutional as a regulation of interstate commerce.

The law is a valid exercise of the power reserved to the state legislature by § 1 of Art. XI of the state constitution to alter the corporate franchise of the plaintiff in error.

Numerous authorities of this and other courts support these contentions.

MR. JUSTICE LAMAR, after making the foregoing statement, delivered the opinion of the court.

There have been two statutes in Wisconsin relating to

letting down the upper berth when the lower was occupied.
The first [1] left the matter to the decision of the occupant
of the lower berth. The second [2] absolutely prohibits the
upper from being let down before it is engaged or occupied.

Concerning the act of 1907, which provided that the
occupant of the lower "should have the right to direct
whether the unoccupied upper should be opened or
closed," the Supreme Court (*State* v. *Redmon*, 134 Wis-
consin, 89, 103) held that the statute was "not a police
regulation, but an unwarranted interference with property
rights; an attempt . . . to give any person at his
option who pays for a part of a section in a sleeping
car the use, free of charge, of the balance thereof; an
obvious . . . attempt . . . to appropriate the
property of one for the benefit of another in violation of
several constitutional safeguards that might be referred
to, but particularly the guarantee that no person shall
be . . . deprived of life, liberty or property without
due process of law." . . . "It follows that the
arbitrary appropriation in the name of law of the space
of an upper berth in a sleeping car for the greater comfort
and safety, as regards the health of the occupant of the
lower berth at his option, . . . is highly oppres-
sive. . . ."

1. But the language of the Act of 1911, now under re-

---

[1] "An act . . . relating to the health and comfort of occupants
of sleeping-car berths.

"Sec. 1. Whenever a person pays for the use of a double lower berth
in a sleeping-car, he shall have the right to direct whether the upper
berth shall be open or closed, unless the upper berth is actually occupied
by some other person; and the proprietor of the car and the person in
charge of it shall comply with such direction." Laws of 1907, c. 266.

[2] "1. Whenever a person shall engage and occupy a lower berth in
a sleeping-car, and the upper berth of the same section shall at the same
time be neither engaged nor occupied, the upper berth shall not be
let down, but shall remain closed until engaged or occupied." Laws of
1911.

view, does not remove the fundamental objection to that class of legislation. For as the State could not authorize the occupant of the lower berth to *take* salable space without pay, neither can the present statute compel the Company to *give* that occupant the free use of that space until it is actually purchased by another passenger. The owner's right to property is protected even when it is not actually in use, and the Company cannot be compelled to permit a third person to have the free use of such property until a buyer appears.

2. While this principle is recognized, it is said that this Act of 1911 was not passed for the purpose of benefiting the occupant of the lower berth, but as a health measure and in the interest of all the occupants of the car. But the statute does not purport to be a health measure, and cannot be sustained as such. For if lowering the upper berth injuriously interfered with the ventilation of the car and the health of the passengers it would follow that upper berths should not be lowered; and if it was harmful to let down the uppers it would be even more harmful to permit additional passengers to come into the car and occupy them. The testimony of witnesses and common knowledge coincide with the trial court's finding of fact that the lowering of upper berths does not endanger the lives, health or safety of persons occupying the lower berth and that keeping the upper closed will not add to the comfort of the public generally. *Lake Shore &c. Ry.* v. *Smith,* 173 U. S. 692. There are some inconveniences and discomforts incident to traveling on a sleeping car, but none of those resulting from the lowering of the upper berth are of a character that can be treated as a nuisance either in law or in fact. For lowering the upper berth is not only not treated as a nuisance or a serious inconvenience and discomfort to passengers, but the language of the statute itself recognizes that the sleeping car company might lawfully sell all of the upper berths and have each of them

occupied. The same is true of the order of the State Commission fixing a rate of $1.50 for the lower berth, $1.20 for the upper berth, and $2.70 for the section. This treats that the space in the section is salable, as a whole or in parts; and, if the space is thus lawfully salable, it is property entitled to protection.

3. The State Supreme Court cited *Lawton* v. *Steele*, 152 U. S. 133; *Lake Shore & M. S. Ry.* v. *Ohio*, 173 U. S. 285; *Atlantic Coast Line* v. *North Carolina Corp. Comm.*, 206 U. S. 1; *New York, N. H. & H. R. R.* v. *New York*, 165 U. S. 628; and after discussing the extent of the police power and the conditions under which it can be exercised, held that it was a reasonable exercise of such power to prohibit the upper berth from being lowered if not engaged or occupied, saying that "if compliance with this [statutory] command imposes extra burdens, they are not of such an unusual nature as to be oppressive; and if it involves additional costs in the conduct of the business, then the defendant can readily be secured against such loss by having the rate adjusted to meet this burden." But if the statute is not a reasonable exercise of the police power and yet operates to take property, such taking cannot be justified on the ground that the Company *may* be able to secure an increase in rates. For, without considering any other question involved, it is sufficient to say that the taking and a fixed right to compensation must coincide, though in some cases the time for payment may be delayed. *Sweet* v. *Rechel*, 159 U. S. 380, 400.

4. The plaintiff also insists that the requirement that the upper berth should not be let down until actually engaged also deprives the Company of its right of management and prevents it from conducting its business so as to secure the privacy of the man or woman occupying the lower berth. It is not necessary to refer to the evidence on that subject because it is a matter of common knowledge that to let down the upper berth during the night would

necessarily be an intrusion upon the privacy of those occupying lower berths. For the glare of the lights and the noise of lowering the upper berth would disturb any except the soundest sleepers. In this respect the statute would lessen the ability of the Company to furnish the place of sleep and rest which it offers to the public. A sleeping car may not be an "inn on wheels," but the operating company does engage to furnish its patrons with a place in which they can rest without intrusion upon their privacy. Holding out these inducements and seeking this patronage, the Company is entitled to the privilege of managing its business in its own way so long as it does not injuriously affect the health, comfort, safety and convenience of the public. The right of the State to regulate public carriers in the interest of the public is very great. But that great power does not warrant an unreasonable interference with the right of management or the taking of the carrier's property without compensation. *Lake Shore & Michigan Ry.* v. *Smith,* 173 U. S. 684; *Northern Pacific Ry.* v. *State of North Dakota,* 236 U. S. 585; *State of Washington ex rel. Oregon R. R.* v. *Fairchild,* 224 U. S. 510, 529; *Missouri Ry.* v. *Nebraska,* 164 U. S. 403, 417; *Great Northern* v. *R. R. Commission,* just decided, *ante,* p. 340.

5. In the brief of counsel for the State it is argued that the statute can be sustained as a valid exercise of the State's reserved power to alter the charter of the Company. That question does not seem to have been raised in the state court, nor was its decision based on that proposition. Indeed such a ruling would seem to have been opposed to *State ex rel. Northern Pacific* v. *R. R. Commission,* 140 Wisconsin, 157, and the *Water Power Cases,* 148 Wisconsin, 124, where it was held that the right to amend a charter does not authorize the taking of the Company's property without just compensation. The same view has been repeatedly expressed in the decisions of this court. For example in *Shields* v. *Ohio,* 95 U. S. 324, it was said

that "the power of alteration and amendment is not without limit. The alterations must be reasonable . . . and consistent with the scope and object of the act of incorporation." . . . Again in *Stearns* v. *Minnesota*, 179 U. S. 223, 259, it was held that the reserved right to amend a corporate charter "does not confer mere arbitrary power, and cannot be so exercised as to violate fundamental principles of justice by . . . taking of property without due process of law." *Lake Shore &c. Ry.* v. *Smith*, 173 U. S. 690; *Stanislaus Co.* v. *San Joaquin Co.*, 192 U. S. 201; *Sinking-Fund Cases*, 99 U. S. 720; *Miller* v. *State*, 15 Wall. 498; see also *Delaware, Lackawanna &c.* v. *Board of Public Utilities*, 85 N. J. L. 28, 38, where it was held that, under such a power, the Company could not be required to furnish free transportation to certain designated officials. This conclusion makes it unnecessary to discuss the assignments relating to interstate commerce.

The judgment is reversed and the case remanded to the Supreme Court of Wisconsin for further proceedings not in conflict with this opinion.

*Reversed.*

MR. JUSTICE McKENNA and MR. JUSTICE HOLMES dissent.