CITY OF JACKSON *v.* McPHERSON.

(In Banc. January 4, 1932.)

[138 So. 604. No. 29484.]

W. E. Morse, of Jackson, for appellant.

168

Howie & Howie, of Jackson, for appellee.

Argued orally by **W. E. Morse**, for appellant and by **Virgil Howie**, and **W. B. Fontaine**, for appellee.

**Griffith, J.,** delivered the opinion of the court.

Appellee is the owner of lot 5, block N, North Park addition in the city of Jackson; said lot being located on the east side of North State street at the corner of Carlisle street. On February 19, 1930, appellee applied to the city for a permit to erect on said lot a gasoline service station, which permit was refused, because the said lot is within the residential zone of the general zoning ordinance of said city, ordained by the governing authorities of said city, and effective on and after May 2, 1929, under the authority of the so-called standard zoning statutes of the state, chapter 308, Laws 1926, now brought forward as sections 2474-2481, Code 1930. From the action of the city commissioners in refusing said permit, appellee appealed to the circuit court, and, upon a hearing by the court, the action of the city authorities was reversed and the permit was ordered to be issued.

In order to affirm the judgment of the trial court in this case, it would be necessary for us to hold that the said standard zoning law, sections 2474-2481, Code 1930,

is unconstitutional and void. This we decline to do; on the contrary, we declare the zoning statute, as it now exists in our Code, to be valid. In so declaring, we are conscious of, and have given due consideration to, what we believe to be the fact that had this same statute been before this court twenty years ago, or perhaps even at a later period, the answer would probably have been the opposite of what we give today. We answer as we now do because, along with nearly all the courts, we have been compelled to see and appreciate that the modern zoning law is essential to meet the requirements of modern conditions. Indeed, we can now see and appreciate that had these laws come earlier, had been earlier perfected and had at an earlier date received approval as to their constitutional validity, an almost incurable situation which now prevails in many large towns and cities could and would have been prevented. But the modern zoning law did not come earlier, because the proposal thus to restrict property owners in the use of their property appeared upon first approach to be in contravention of constitutional rights and as an arbitrary substitution of governmental regulation for that which was believed to belong exclusively to the field of private determination. It was difficult therefore to secure, in the first place, the necessary legislation; and, in the second place, it was even more difficult to obtain the cooperation of those who were adversely affected, and who naturally regarded all such laws and regulations as unjust and as an unwarrantable encroachment upon their private property rights. Those so affected, of course, appealed to the courts, and as was but natural, also, the judges were alarmed at the proposed extension of governmental interference, and the earlier decisions were generally adverse to the proposal.

But as time and experience further demonstrated the necessities of the situation, legislation persisted in its

efforts; and the legislative enactments were improved and perfected so as to meet the specific objections made, and soon thereafter, as the courts themselves became the better convinced that the constitutional guaranties must be allowed to expand in their application and keep pace with the new conditions and new problems of urban life, the earlier decisions were made to give way to the requirements of the new and changing conditions; so that now the modern standard zoning laws, such as the statutes recently enacted in this state, have received the approval, so far as constitutional questions are concerned, of the overwhelming weight of judicial opinion, both state and federal. The opinion of the Supreme Court of the United States in Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016, upholding the constitutionality of the recently enacted zoning laws has, in fact, been generally accepted as having closed the debate on the general subject, and all or practically all the states which had not formerly taken that position are now reversing their decisions so as to conform to the weight of judicial opinion.

We might well close the discussion in upholding the constitutionality of our standard zoning laws, as they are now contained in our statutes, by a simple reference to the opinion last mentioned, and by the reference to the present weight of authority on the subject, and by announcing our adherence to that weight of authority; but we take the privilege to add that we are in accord with the later decisions as a matter of original reasoning. It must be apparent now to the thoughtful observer of the tendencies of the last twenty-five years that the majority of the population of this country will eventually be found in cities of over five thousand inhabitants. The increasing size of this majority will be limited only by the capacity of field and pasture to supply the urban portion of the population with raw products. That ca-

pacity is being constantly augmented by new contrivances of farm machinery and improved transportation. When our Constitutions were made and all the treasured constitutional rights expressed therein were secured, it was the product of a population which was rural; the inspiration was from the rural home and from the prevailing rural life, wherein the home was the center of affection and interest. If the conditions which gave origin to Constitutions and have thus far preserved them should be permitted to be taken substantially out of the lives of those who are henceforward to constitute the majority of the people, then we might well look upon the future with apprehension. It is therefore a consideration of supreme importance to state and nation that the home and desirable home surroundings in cities and large towns shall be preserved and made permanently secure. It is too much to expect, or at least it is a dangerous experiment to suppose, that that profound and dependable patriotism which is necessary to preserve and maintain an ideal government like ours could survive the lapse of time crowded into apartments and tenements, where the children for generation after generation shall have no place to develop except in the immediate environments of commerce and in the clangor of factories. We need not elaborate upon considerations so distinctly vital; we merely introduce this as among those in the mature view of which we have no hesitancy in declaring that those reasonable regulations which will preserve the home from intrusion and will secure its permanency is within the legitimate field of the police power of the state; and that zoning laws, such as those now in the statute books of the state, to that end, are valid. And it is only a completion, a complement of the plan, that these laws shall reasonably permit at the same time a further zoning into separate commercial and industrial areas.

Appellee contends, however, that, conceding the validity of the zoning law and generally of the zoning ordinance, the action of the city authorities in including this particular piece of property within the residential zone was an arbitrary, unjust, and discriminatory action on the part of said municipal council. There is substantially no dispute in the record as to the physical facts and surroundings. Opposite this property and on the west side of North State street is the large property of the Blind Institute. To the south of the lot here in question is the residence of appellee, and next south is a church. To the north and across Carlisle street is the Guest House of the Baptist Hospital and next is the hospital; these two occupying the length of the block from Carlisle northward to Manship. To the east, all the adjacent property is occupied by residences. Without going into further details of the situation, we may say that a majority of the members of the court are of opinion that this property was properly placed within the residential zone. Moreover, the determination of this question was vested by law in the city commissioners, and, unless the court can say that their action was unreasonable and arbitrary, there is no proper power in the court to interfere.

It is next contended by appellee that those sections of the zoning ordinance providing for variations are void, and that therefore the entire ordinance is invalid. The ordinance contains a provision that if any section, clause, or provision of the ordinance shall be found to be invalid, the same shall not affect the remainder. The application here in question does not involve an attempt on the part of the council to make a variation. On the contrary, they have refused to vary. The point urged by appellee is therefore not before the court, and we are not required or authorized to express any opinion thereon. In dealing with these zoning laws and ordinances, all the courts

have adhered to the policy of dealing with particular or specific provisions thereof only as they are directly involved, and when decision on the specific provision is actually necessary.

Finally, it is contended that this property is the identical lot which was involved in Fitzhugh v. City of Jackson, 132 Miss. 585, 97 So. 190, 33 A. L. R. 279; that, subsequent to that decision, appellee purchased said property; and that the decision in that case has become a rule of property. The foundation for the decision in the Fitzhugh case was that there was then no adequate state zoning law under which municipalities could act as was attempted to be done in that case. The doctrine of the rule of property, based upon court decisions, has no operation as against subsequent legislation on the subject involved. The present standard zoning law was passed three years later than the decision in the Fitzhugh case.

Reversed, and judgment here for appellant.

**Ethridge, J.**, delivered a dissenting opinion.

I dissent from the majority opinion, as I think chapter 308, Laws of 1926, has been improperly construed. In fact it has been given no written construction in the majority opinion concerning what the city shall do under section 4 of said chapter. The ordinance adopted by the city purporting to act under said chapter does not conform to its requirements, in my opinion, and the judgment could be affirmed upon that ground alone. It makes no declaration of any facts influencing the city's judgment in laying out its zoning districts, and if the ordinance be held valid, and the statute be held valid with the construction placed upon the statute that the ordinance is a proper ordinance, then the statute would violate the equality and due process clause of the Fourteenth

Amendment to the Federal Constitution, and would also violate the fourteenth, seventeenth, and twenty-fourth sections of the state Constitution.

Before proceeding to analyze the statute and ordinance, and a general examination of the authorities, I desire to state a few fundamental principles underlying our system of government. In the Declaration of Independence it was declared "that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness." The acquiring and the using of property is one of the chief means of enjoying liberty and the pursuit of happiness. In the Virginia Constitution of 1776 (section 1), the first American Constitution, and one that antedated the Declaration of Independence, it was declared that all men are, by nature, equally free and independent, and have certain inalienable rights of which, when they enter society, neither they, nor their posterity, can be deprived. Most of the other Constitutions contain similar expressions, and these were understood to mean that the right of every citizen in the enjoyment of his liberty and property was not to be restrained by government in any greater degree than was necessary for the enjoyment of similar rights by the general public. Limitations came to be understood as only authorizing interference when the public health, morals, or safety were concerned. The use of property is the greatest thing concerning it. When a man acquires property, he acquires the right to its use, and it is only when that use, whatever it may be, interferes with the rights of some other person that the government may restrain that use, and then only to the extent that it infringes upon public health, public morals, or the public safety. Mr. Justice Field, in his opinion in the case of Munn v. Illinois, 94 U. S. 113, 141, 24 L. Ed. 77, said: "All that is beneficial in property arises from its use, and the fruits

of that use; and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession. If the constitutional guaranty extends no further than to prevent a deprivation of title and possession, and allows a deprivation of use, and the fruits of that use, it does not merit the encomiums it has received.''

In Thompson v. Kreutzer, 112 Miss. 165, 72 So. 891, in the first syllabus, it was held ownership is not a privilege conferred by government, but a right which government is organized to protect. In a strict legal sense, property is synonymous with the right of ownership, and means one's exclusive right of possession.

It is admitted in the majority opinion that the present construction of the constitutional provision would not have been made twenty-five years ago; which is to say that the framers who made the Constitution and used the language it contains, and who were supposed to have known what was desired to be secured, would hold contrary to the present case. Constitutions do not change their meaning. It is true that frequently conditions arise that make inapplicable rules that would be applied to a different situation; but it is not the Constitution that changes, but the conditions to which the Constitution is to be applied. It is fundamental that the provisions in the Bill of Rights, sections 14, 17, and 24 of the state Constitution, and the Fourteenth Amendment to the Federal Constitution, are to be liberally construed in favor of the citizen to attain the principles and liberties intended to be reserved to the citizen free from interferences by the government. If we apply liberal principles to the construction of these provisions, the act of the city, in the present case, cannot be sustained. It is only by giving a strict construction against the individual, and a liberal one in favor of the government, that the ordinance can be sustained, and the statute as construed by the majority opinion can be sustained.

It may be conceded that it is within the power of the legislature to authorize a city or municipality to restrict manufacturing plants and such other business enterprises in the city as seriously interfere with the peace and security of the citizen in the enjoyment of his property. In other words, a business, although a legitimate business, if it constitute a nuisance, or something approximating a nuisance, by which the enjoyment and reasonable quiet and peace of the other citizens are interfered with, can be segregated and placed in a district suitable for its exercise; but I do not think that a use of property that is harmless, or does not constitute a nuisance, or seriously interfere with either the health, morals, or safety of other people, and other property, can be prohibited. Such, at least, has been our conception of our constitutional provisions in this state heretofore.

I will briefly discuss the statute and its requirements as I understand them, and show the nonconformity to it in the enactment of the city ordinance, and then will revert to a discussion of the authorities and principles governing the case.

Chapter 308, Laws of 1926, in its first section provides that any municipality of over five thousand inhabitants is authorized to regulate the height, number of stories and size of buildings and other structures, the size of yards, etc., the density of population and the location and use of buildings, and, for effecting such purpose, under section 2, may divide the municipality into districts prescribing the area, and within such districts may regulate and restrict the erection, construction, reconstruction, and alteration of buildings, structures, or land.

By section 3 it is provided that such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion on the streets and to secure safety from panic, fire, and other dangers, and to prevent overcrowding of land.

By section 4, it is provided that "the legislative body of such municipality shall provide for the manner in which such regulations and restrictions and the boundaries of such districts shall be determined, established, and enforced, and from time to time, amended, supplemented or changed. However, no such regulation, restriction or boundary shall become effective until after a public hearing, in relation thereto, at which parties in interest, and citizens, shall have an opportunity to be heard. At least fifteen days' notice of the time and place of such hearing shall be published in an official paper, or a paper of general circulation, in such municipality."

By section 5, it is provided that such regulations, etc., may be amended, supplemented, changed, or modified, from time to time; but in case of a protest against such change signed by the owners of twenty per cent or more either of the area of the lots included in such proposed change, or of those immediately adjacent to the rear thereof, extending one hundred sixty feet therefrom, or of these directly opposite thereto, extending one hundred sixty feet from the street frontage of such opposite lots, such amendment shall not become effective except by the favorable vote of two-thirds of all the members of the legislative body of such municipality. As there are four sides to this property, twenty per cent of one-fourth of the property owners may thwart the will of eighty per cent of three-fourths of the property owners within such distance, unless the municipal authorities, by a two-thirds vote, go with the majority. In other words, the municipal authorities are restrained from exercising their free and untrammeled judgment. It rests with the minority to enjoin the property owner from the control of his property.

In my opinion, section 4 above quoted requires a municipality to provide by law, containing a definite recital of the territory, together with the reasons for placing the

property within one of its zones, for its zoning ordinances. In other words, the section contemplates that the city shall provide by ordinance, classifications of property not merely as to the area, but also conditions within that area which warrant its segregation into the particular zone. The ordinance must, as the statute is required to do, conform to the due process of law, and cannot exercise purely arbitrary discretion. The territory that is to compose a factory district should be definitely described, and the conditions recited that warrant placing such territory in such classification. Likewise, business districts should be so treated, and the same is true of residential districts. In other words, the statute did not intend for the municipal authorities to act arbitrarily. They could not place some property in a manufacturing district leaving other property similarly situated outside such district, and the same is true of other zones.

There must be a standard by which the use of property is determined, and this standard must be so certain that all persons of reasonable intelligence will know the basis upon which the city authorities act, so that they may take appropriate action in reference thereto. The map merely shows certain territory in certain colors constituting each particular zone. In residential sections, there are areas segregated from each other by very small patches or lots of land, and, under section 5 of the act, the city authorities assume, and will act upon the theory that they may convert residence lots into business lots without any criterion or standard to go by, and may favor one person, and deny the favor to another situated precisely alike. For instance, four lots border on an intersection where one street crosses another, each lot thoroughly suitable for, say, a filling station. Under the ordinance, the city authorities may grant a privilege to one for any reason or without reason, and refuse same

to another for any reason, or without reason, to suit their own caprice.

In the latter part of section 16 of the ordinance, it is provided that the city authorities may, from time to time, supplement or change by ordinance the boundaries of districts or regulations herein established. Any proposed amendment, supplement, or change shall first be submitted to the city engineer for his recommendations and report, and that a public hearing shall be had before the adoption of any amendment, notice of which hearing shall be given by publication. It is also provided that if a protest be presented in writing to the city clerk within fifteen days from date of last publication, duly signed and acknowledged by the owners of twenty per cent or more of any frontage within one hundred sixty feet proposed to be altered, or by the owners of twenty per cent of the frontage immediately in the rear thereof, or by the owners of twenty per cent of the frontage directly within one hundred sixty feet directly opposite the frontage proposed to be altered, said change shall not be made. This places within the power of adjoining property owners to defeat the owners of the desired use of the amendment, and absolutely control the governing authorities. This is contrary to the statute above quoted which, in such cases, merely requires two-thirds of the city authorities to vote for the proposed change or amendment. It is not competent for the owners thus to be controlled by a fraction of neighboring property owners. The law nowhere contemplates government by the caprice, whim, or arbitrary will of any man, or body of men.

The ordinance and statute, as construed, are clearly prohibited by sections 14, 17 and 24 of the Constitution.

In Quintini v. Bay St. Louis, 64 Miss. 483, 1 So. 625, 60 Am. Rep. 62, decided in 1886, the court declared that "the legislature has no power to declare, or to authorize

the municipal authorities to declare, private residences to be nuisances,'' because the same has a tendency to depreciate the value of property of persons near by or obstruct the view of same, or to keep the breeze therefrom. In the second syllabus, it is said that ''The legislature cannot, constitutionally, declare that a given use of a particular tract or parcel of land is harmful and a nuisance. This would be exercising a judicial function.'' In the body of the opinion, at page 490 of 64 Miss., 1 So. 625, 628, the court said: ''The law can know no distinction between citizens because of the superior cultivation of the one over the other. It is with common humanity that courts and legislatures must deal; and that use of property which in all common sense and reason is not a nuisance to the average man cannot be prohibited because repugnant to some sentiment of a particular class. That the legislature, in the exercise of the police power, may prohibit in particular localities such use of property as is injurious to public health, is admitted, and what it may do may also be authorized to be done by the local authorities; but it does not follow that it may by a mere declaration convert the harmless, proper, and ordinary use of property into a nuisance. Where the use of the land furnishes the test for the determination of the constitutionality of the law, the legislature may not conclusively determine the effect to be harmful. This would be the assumption of judicial functions by the legislative department, and, if yielded to by the courts, would be an abrogation of those duties and powers committed by the constitution to the judicial department, and the untrammeled exercise of which is essential for the preservation of life, liberty, and property. Hutton v. Camden, 39 N. J. Law, 122, 23 Am. Rep. 203. The effect of the ordinance is to deprive the owners of property of its lawful use for a supposed public advantage, and before this can be done there must be just compensation first made.''

In Pieri v. Mayor, etc., of Town of Shieldsboro, 42 Miss. 493, the court held that "the corporate authorities of a city or town cannot, by an arbitrary ordinance, destroy private property by force, or compel the owner to destroy or remove the same, unless it was a nuisance and so declared by ordinance, and shown to be such by its locality or the sanitary condition of the city or town." This case was decided in 1869. The last two cases mentioned were decided prior to the Constitution of 1890 and construed sections 14 and 17 as contained in the prior Constitutions, giving the meaning to each section which was carried into the Constitution of 1890, by the Constitutional Convention, the members of which, of course, were familiar with these decisions, and approved the construction placed thereon by these cases. The court and government agencies are therefore bound by this construction, and have no power to change the meaning given it by the Convention.

A like construction was involved in the case of Crittenden v. Booneville, 92 Miss. 277, 44 So. 723, 131 Am. St. Rep. 518, where it was held that "the operation of billiard tables and pool rooms: (a) Are not wrong per se; and (b) Are by statute, Code 1906, section 3778, made the subject of a license or privilege tax; therefore (c) Code 1906, section 3340, giving municipalities power to regulate and suppress them, only authorizes their prohibition when so conducted as to become a nuisance." It was also held that powers delegated to municipalities by the legislature are intended to be exercised in conformity to, and consistent with, the general laws of the state; and are to be construed most strongly against a right claimed but not clearly given; and that an ordinance prohibiting properly conducted lawful business, the subject of a license tax, is void.

These decisions establish the fact that, under the Constitution of 1890, all private property can only be de-

stroyed or its use seriously injured or restrained when it becomes a nuisance; that is to say, when its use deleteriously affects the interest of the community in the enjoyment of their equal liberty and property.

However, in the case of Fitzhugh v. Jackson, 132 Miss. 585, 97 So. 190, 33 A. L. R. 279, this court specifically held that the power there sought to be exercised could not be constitutionally exercised. It there adopted the philosophy of the line of cases that hold against the validity of zoning ordinances of the kind involved in the case at bar, citing and referring specifically to the case of Spann v. Dallas, 111 Tex. 350, 235 S. W. 513, 19 A. L. R. 1387.

Although the statute now referred to had not been then enacted, the city had adopted, under a statute securing large powers to enact police regulations, an ordinance of the same type as the one in the present case, except that the property owners of adjoining property sought to be used could absolutely prohibit the city from permitting the use contrary to the general zoning ordinance. The question was squarely presented, and it was perfectly proper to decide it in that case as the court did decide it. The change in the personnel of the court since then should not, in my judgment, cause a departure from that case.

While the due process and equal protection clause of the Fourteenth Amendment to the Federal Constitution affords a minimum of constitutional protection to the citizen, it does not prevent states from giving a broader and more comprehensive protection to their constitutional provisions. The state has the power to construe its own Constitution, and should do so in the light of conditions and the history of the state and the philosophy of prior judicial decisions. It may, and should, in many cases, give a more comprehensive protection than the federal courts give the Federal Constitution in cases

growing out of differences between the nation and the states. The national court is restrained somewhat from giving broad and liberal interpretations to federal provisions by reason of the fact that the conditions are variant in the different states of the Union. A uniform rule is difficult to be made just and applicable to all the varying conditions. The state having the power to construe its constitutional provisions, and having already given them a broad and liberal construction, it should be adhered to, even if not in harmony with the construction placed upon the Fourteenth Amendment by the United States Supreme Court.

However, as I understand the decisions of the United States Supreme Court, they do not go as far in upholding zoning laws as the majority have gone in the present case. The majority opinion, without discussion, rests upon the case of Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016, wherein the court upheld a zoning law therein involved. It there pointed out that in individual cases such regulations might be unreasonable and void, and, at page 395 of 272 U. S., 47 S. Ct. 114, 121, page 314 of 71 L. Ed., the court said: "It is true that when, if ever, the provisions set forth in the ordinance in tedious and minute detail, come to be concretely applied to particular premises, including those of the appellee, or to particular conditions, or to be considered in connection with specific complaints, some of them, or even many of them, may be found to be clearly arbitrary and unreasonable. But where the equitable remedy of injunction is sought, as it is here, not upon the ground of a present infringement or denial of a specific right, or of a particular injury in process of actual execution, but upon the broad ground that the mere existence and threatened enforcement of the ordinance, by materially and adversely affecting values and curtailing the opportunities of the market, constitute a

present and irreparable injury, the court will not scrutinize its provisions, sentence by sentence, to ascertain by a process of piecemeal dissection whether there may be, here and there, provisions of a minor character, or relating to matters of administration, or not shown to contribute to the injury complained of, which, if attacked separately, might not withstand the test of constitutionality.'' The court there recognized and reserved the question as to arbitrary and unreasonable acts as applied to individual cases.

In the case before us, the proceeding is by an application to secure and permit the use of property, and is an effort to coerce permission to use the property in the manner indicated. The property involved is peculiarly adapted to the use sought to be made of it, that of a filling station; being located on one of the intercounty and interstate highways running through the city, and being already paved and important for motor travel. The property is situated so that, in its operation, it will not, in any manner, interfere with the enjoyment of property by any adjoining user. A filling station is a legitimate and useful business now to the traveling public. The property, as shown by the record, is situated in a block in which the owner's residence is the only residence in that part of the block adjoining on the intercounty and state highway. To the north of this property and across Carlisle street therefrom is the Guest House of the Baptist Hospital, and north of the Baptist Hospital and on the opposite corner therefrom is a business house. To the west of this property is the Institute for the Blind, and north of that institute is the State Charity Hospital. South of McPherson's residence is the Christian Science Church; the residence and the church being the only buildings in the block lying along the highway.

Filling stations are not unsafe and dangerous. They are permitted all through the country at intervals, and

are surrounded, in many instances, by residence property. These filling stations are so constructed and equipped that practically no hazard is involved in their operation and there is nothing that could be said to be injurious to other property.

We have held that they are not nuisances per se. National Refining Co. v. Batte, 135 Miss. 819, 100 So. 388, 35 A. L. R. 91.

In State v. Roberge, 278 U. S. 116, 49 S. Ct. 50, 73 L. Ed. 210, the United States Court held that zoning ordinances must find justification in the police power exerted in the interest of the public; and that legislatures may not, under the guise of police power, impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities; and that the right to devote real estate to any legitimate use is property within the protection of the Constitution. In the course of the opinion, 278 U. S. 116, 49 S. Ct. 50, 52, 73 L. Ed. at page 214, the court said: "It is not suggested that the proposed new home for aged poor would be a nuisance. We find nothing in the record reasonably tending to show that its construction or maintenance is liable to work any injury, inconvenience or annoyance to the community, the district or any person. The facts shown clearly distinguish the proposed building and use from such billboards or other uses which by reason of their nature are liable to be offensive." The court definitely rejected, in this case, the right of the property owner to use his property being made dependent upon the wish or objection of the neighboring property owners. At page 213 of 73 L. Ed. (278 U. S. 116, 49 S. Ct. 50, 51), the court said: "The governmental power to interfere by zoning regulations with the general rights of the land-owner by restricting the character of his use, is not unlimited and, other questions aside, such restriction cannot be imposed if it does not bear a substantial relation

to the public health, safety, morals, or general welfare.'' Nectow v. Cambridge, 277 U. S. 188, 48 S. Ct. 447, 72 L. Ed. 844. The court in the Roberge case further said: ''Legislatures may not, under the guise of the police power impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities. [Citing authorities.] The right of the trustee to devote its land to any legitimate use is property within the protection of the Constitution. The facts disclosed by the record make it clear that the exclusion of the new home from the first district is not indispensable to the general zoning plan.''

In the case of Nectow v. Cambridge, supra, the court said: ''An owner of property which borders on factories with railroad tracks near is unconstitutionally deprived of his property without due process of law by zoning it into the residential class for which it cannot be profitably used, where such action will not promote the health, safety, convenience, and general welfare of the inhabitants of the part of the city affected.'' At page 844 of 72 L. Ed. (277 U. S. 183, 48 S. Ct. 447, 448), the court also said: ''An inspection of a plat of the city upon which the zoning districts are outlined, taken in connection with the master's findings, shows with reasonable certainty that the inclusion of the locus in question is not indispensable to the general plan. The boundary line of the residential district before reaching the locus runs for some distance along the streets, and to exclude the locus from the residential district requires only that such line shall be continued one hundred feet further along Henry street and thence south along Brookline street. There does not appear to be any reason why this should not be done. Nevertheless, if that were all, we should not be warranted in substituting our judgment for that of the zoning authorities primarily charged with the duty and responsibility of determining the question.''

The federal decisions on constitutional law and the due process clause of the Constitution are quite numerous, and many applications have been made of that provision of the Constitution. It is rather difficult to draw the line in all instances so as to harmonize the various decisions; but it is clear from a study of them that the courts will not permit an arbitrary deprivation of property or its use by the state, or any state agency, unless that property be compensated for by the public authorities. The federal court and this court are both committed to the proposition that constitutional provisions to secure a citizen in his rights are to be given a liberal construction in favor of the citizen. In Boyd v. United States, 116 U. S. 630, 6 S. Ct. 524, 532, 29 L. Ed. 746, the Supreme Court of the United States said, in referring to the opinion of Lord Camden in Entick v. Carrington (19 How. St. Tr. 1029) : ''The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach further than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offense,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony, or of his private papers to be used as evidence to convict him of crime, or to forfeit his goods, is within the condemnation of that judgment.'' Further along in

the opinion, the court said: "It is abhorrent to the instincts of an Englishman: it is abhorrent to the instincts of an American. It may suit the purposes of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom. . . . It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half of their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be obsta principiis."

Constitutional guaranties may not be made to yield to mere conveniences. Weaver v. Palmer Bros. Co., 270 U. S. 402, 46 S. Ct. 320, 70 L. Ed. 654; Schlesinger v. Wis., 270 U. S. 230, 46 S. Ct. 260, 70 L. Ed. 557, 43 A. L. R. 1224.

Of course a municipal ordinance is a statute within the meaning of these cases.

The ordinance adopted under the statute is so vague and uncertain that it furnishes no criterion by which the property owner can assert his rights. He can appear before the public authorities and supplicate and persuade; but he has no rights to point out by which he can secure his rights. The ordinance and statute, as construed, fail to conform to the law as announced in United States v. L. Cohen Gro. Co., 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045; Kennington v. Palmer, 253 U. S. 100, 41 S. Ct. 303, 65 L. Ed. 528. In Coppage v. Kansas, 236 U. S. 1, 35 S. Ct. 240, 59 L. Ed. 441, L. R. A. 1915C,

960, the United States Supreme Court held that "A statutory provision which is not a legitimate police regulation cannot be made such by being placed in the same act with a police regulation, or by being enacted under a title that declares a purpose which would be a proper object for the exercise of that power."

That is what the statute and ordinance here under discussion undertakes to do. It copies certain language out of one of the Supreme Court decisions bearing on the police power, and proceeds to declare that to be the purpose of the statute. Of course, that adds nothing to the statute itself. There are no facts recited in the ordinance or the statute that would warrant the application of the principles announced in the opinion. The legislature cannot escape the provision of the Fourteenth Amendment to the Federal Constitution, nor the restraints of sections 14, 17 and 24 of the State Constitution.

In the case of Coppage v. Kansas, supra, 236 U. S. 1, 35 S. Ct. 240, 245, 59 L. Ed. at page 447, L. R. A. 1915C, 960, the court said, "But the 14th Amendment, in declaring that a state shall not 'deprive any person of life, liberty, or property without due process of law,' gives to each of these an equal sanction; it recognizes 'liberty' and 'property' as coexistent human rights, and debars the states from any unwarranted interference with either. And since a state may not strike them down directly, it is clear that it may not do so indirectly, as by declaring in effect that the public good requires the removal of those inequalities that are but the normal and inevitable result of their exercise, and then invoking the police power in order to remove the inequalities, without other object in view. The police power is broad, and not easily defined, but it cannot be given the wide scope that is here asserted for it, without in effect nullifying the constitutional guaranty." After pointing out some authorities, the court said: "An evident and controlling distinction

is this: that in those cases it has been held permissible for the states to adopt regulations fairly deemed necessary to secure some object directly affecting the public welfare, even though the enjoyment of private rights of liberty and property be thereby incidentally hampered. . . . In short, an interference with the normal exercise of personal liberty and property rights is the primary object of the statute, and not an incident to the advancement of the general welfare. But, in our opinion, the 14th Amendment debars the states from striking down personal liberty or property rights, or materially restricting their normal exercise, excepting so far as may be incidentally necessary for the accomplishment of some other and paramount object, and one that concerns the public welfare. The mere restriction of liberty or of property rights cannot of itself be denominated 'public welfare,' and treated as a legitimate object of the police power; for such restriction is the very thing that is inhibited by the Amendment.''

In Chicago, R. I. & P. R. Co. v. U. S., 52 S. Ct. 87, 92, 76 L. Ed. page —, the court held that ''Confiscation may result from a taking of the use of property without compensation quite as well as from the taking of the title,'' and that ''The use of railroad property is subject to public regulation, but a regulation which is so arbitrary and unreasonable as to become an infringement upon the right of ownership constitutes a violation of the due process of law clause of the Fifth Amendment.'' In that case, the court was dealing with regulations of a railroad affected with a public interest, and consequently the governmental power of limiting and regulating the use is greater than that of private property. The court quoted as authority for its opinion Chicago, M. & St. P. R. Co. v. Minnesota, 134 U. S. 418, 10 S. Ct. 462, 33 L. Ed. 970, 3 Interst. Com. R. 209; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 S. Ct. 1047, 38 L. Ed. 1014, 4

Interst. Com. R. 560; Chicago, M. & St. P. R. Co. v. Wisconsin, 238 U. S. 491, 35 S. Ct. 869, 59 L. Ed. 1423, L. R. A. 1916A, 1133. In this latter case, at page 1423 of 59 L. Ed. (238 U. S. 491, 35 S. Ct. 869, 872) the court had before it a statute of the state of Illinois prohibiting the letting down of an upper berth when the lower one was occupied, and another statute prohibiting the renting of an upper berth against the consent of the occupant of the lower berth. After setting out references to the statute, and the decisions of the state, the court said: "But the language of the act of 1911, now under review, does not remove the fundamental objection to that class of legislation. For as the state could not authorize the occupant of the lower berth to take salable space without pay, neither can the present statute compel the company to give that occupant the free use of that space until it is actually purchased by another passenger. The owner's right to property is protected even when it is not actually in use, and the company cannot be compelled to permit a third person to have the free use of such property until a buyer appears."

In the case of Lake Shore & M. S. R. Co. v. Smith, 173 U. S. 684, 19 S. Ct. 565, 43 L. Ed. 858, the court held that a statute of Michigan requiring railroads to sell one thousand mile tickets at specific rates less than their ordinary rates, good for the purchaser, wife, and children, for two years, deprived the company of its property without due process, and that such tickets could not be justified under the doctrine that it made for the public convenience.

In Wolff Packing Co. v. Court of Industrial Relations of State of Kansas, 267 U. S. 552, 45 S. Ct. 441, 445, 69 L. Ed. 785, the Supreme Court of the United States said: "The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary

or without reasonable relation to some purpose within the competency of the state to effect"—citing Meyer v. Nebraska, 262 U. S. 390, 43 S. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446; Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819.

There are many other authorities that I have examined, and could quote from, but, owing to the great length of this opinion, I will not do so.

I think the learned circuit judge was correct, and should be affirmed.