St. John The Baptist Greek Catholic Church of Perth Amboy, New Jersey, complainant-appellant,

*v.*

George Gengor et al., defendants-respondents.

[Submitted May term, 1936. Decided January 22d, 1937.]

*Mr. David T. Wilentz,* for the appellant.

*Mr. Stephen F. Somogyi,* for the respondents.

The opinion of the court was delivered by

HEHER, J.

In so far as paragraph 8 of chapter 150 of the laws of 1914 (*P. L. p. 263*) purports to invest the trustees (or a majority of them) of the existing corporation, St. John the Baptist Greek Catholic Congregation, with authority, not then possessed under its constitution or laws, or otherwise, to consent, without congregational sanction, to the "organization or incorporation" of that religious entity under the provisions of that enactment, it constitutes a legislative usurpation of power.

This body was organized on September 13th, 1897, under the provisions of an act entitled "An act to incorporate trustees of religious societies," approved April 9th, 1875. *3 Comp. Stat. 1910 p. 4307.* The trustees, chosen in the manner therein prescribed, are constituted "a body politic and corporate in law;" and they hold the temporalities of the church "in trust, without limitations, for the use of the congregation." They "have no right in equity to control or dispose of the church property except as directed so to do by the *cestui que trust.*" The beneficiaries of this simple trust are vested with both the *jus habendi* and the *jus disponendi*. *Morgan* v. *Rose, 22 N. J. Eq. 583.*

But this is not the case with religious societies organized under the supplement of 1914, *supra*. This enactment is modeled upon the plan of the statute providing for the incorporation of Roman Catholic churches or congregations. *3 Comp. Stat. 1910 p. 4327.* It sets up a radically different corporate structure. The members of the society are deprived of all voice in the selection of the corporation's trustees and the management of its temporal affairs; and they bear a basically different relation to its property.

We do not concur in the view expressed by the learned vice-chancellor that, unlike the corporation provided by the act which it supplements, "the congregation, and not the trustees, is the body corporate." While paragraph 6 conditions the validity of its proceedings and secular transactions upon the approval "of a majority of all the members of such corporation," the trustees, qualified as in the act prescribed, constitute, as under the original act, the corporate body.

Paragraph 2 ordains that, upon the filing of a certificate signed by the Catholic bishop having, in virtue of papal authority, "supervision over Ruthenian Catholics of the Greek rite in the United States," together with his secretary or chancellor, the pastor of "such Ruthenian Greek Catholic church or congregation for the time being," and two lay members of the church or congregation *elected by them,* "setting forth the name by which *they and their successors* shall be known and distinguished *as a body corporate,* * * * such church or congregation shall be a body corporate by the name or title so taken, certified and recorded." Paragraph 3 endows "the trustees of such corporation, * * * and their successors * * *, by such name of incorporation," with capacity to acquire, purchase, have and hold, and to lease, sell, grant, assign, demise, alien and dispose of, real and personal property; to sue and be sued; *"to have perpetual succession as such corporation;"* to make by-laws and rules "for the regulation and management of their affairs, properties and institutions;" to appoint officers, agents and employes; and generally, "to have the management, direction and control of all the civil and temporal affairs of such congregation, church or parish."

The proceedings and acts of the trustees are made subject to the written approval of the bishop, or the church officer exercising the authority of that office. Provision is made in paragraph 4 for the perpetuation of "a line of succession in the trustees," by constituting the "Ruthenian Greek Catholic Bishop in communion with the Roman See," and the pastor of the church or congregation, trustees in virtue of their respective offices, and investing them with authority to fill

vacancies in the lay trusteeships. The society membership has no right of participation in the perpetuation of the corporate existence.

Any doubt as to the legislative intent in this regard is dispelled by the language of the title of the act. As Chief-Justice Beasley observed in *Morgan* v. *Rose, supra,* the title expresses a purpose "to incorporate trustees of religious societies; it is not its office to incorporate the society itself, but to confer certain definite franchises on a select body of such society." It is the duty of the courts to construe a statute so as to render it constitutional, if it is reasonably susceptible of such an interpretation. And the title is, under the constitution, a part of the act, and is of necessity to be regarded in construing it. The title forms a limitation upon the enacting clauses, and a construction that would enlarge their scope beyond the object expressed in the title is for this reason to be rejected. Any ambiguity in the enacting clauses may be resolved by resort to the title. *Addotta* v. *Blunt, 114 N. J. Law 85.*

Moreover, while the members of the Ruthenian Church are in full communion with the Roman Catholic Church in matters of faith and doctrine, and acknowledge the spiritual supremacy of the Pope as the Bishop of Rome, they still retain unimpaired, under the Union of Brest-Litovsk, concluded in 1596, and the subsequent Treaty of Ungvar, negotiated in 1646, all the rights, privileges, immunities and practices of the ancient Eastern or Byzantine rite, not inconsistent with the fundamental christian faith of the Western or Latin church. The immemorial Slavonic liturgy and discipline and many of the outward forms of the Greek Catholic Orthodox Church were preserved by these treaties. In relation to temporalities, these uniate churches are in no sense subject to the jurisdiction of the Holy See. Unity in faith alone subsists and binds the Ruthenes, a term used by the Latin Church to distinguish the uniates from the northern Russians who adhered to the schism, to the primacy of the Bishop of Rome. In confession of faith they are one with Rome. But they are organized separately. The ecclesiastical and temporal jurisdictions are separate and independent.

Protracted discussion is hardly necessary to demonstrate that it was beyond the power of the legislature to invest the corporate trustees (it is to be remarked, parenthetically, that the statute seems to contemplate individual rather than collective action) with authority to take, without the consent of the society, the course of action which, in virtue of the statute, *ipso facto* effected a dissolution of the corporation and a surrender of the immemorial rights and privileges thus reserved, and to divert its property, franchises and temporalities to another corporate jurisdiction. While it is clear from what has been said that the consummation of the proposed plan would not work a fundamental change in the primary objects and purposes of the society, as distinguished from the means devised for their attainment, it would provide a corporate body having a substantially different form of government and effect a radical alteration of the members' rights in the property of the society, as well as a deprival of religious rites deemed material.

The principle of due process, fundamental in the social compact and also made the subject of express constitutional precept, secures the individual "from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." *Bank of Columbia* v. *Okely, 4 Wheat. 235, 244; 4 L. Ed. 559.* It condemns the exercise of arbitrary power by any branch of government.

While government possesses inherent authority, subject to restraints which need not be here set out, to appropriate the property of the citizen for the necessities of the state, there is no principle known to our system which sanctions the involuntary transfer of one's property to another, for the private use and benefit of the latter, whether by general law or by special enactment. The basic rule is that "the purpose must be public, and must have reference to the needs or convenience of the public, and no reason of general public policy will be sufficient to validate other transfers when they concern existing vested rights." *Cooley Consl. Lim. (8th ed.) 744.* See *Chicago, Milwaukee and St. Paul Railroad Co.* v. *Wisconsin,*

*238 U. S. 491; 35 S. Ct. 869; 59 L. Ed. 1423; Ochoa* v. *Hernandez y Morales, 230 U. S. 139; 33 S. Ct. 1033; 57 L. Ed. 1427; 12 C. J. 1252, 1255.* This doctrine, rooted in natural justice and shielded by the twenty-ninth chapter of Magna Charta, is of the essence of the constitutional guaranties of due process of law. *Munn* v. *Illinois, 94 U. S. 113; 24 L. Ed. 77.*

If section 8 be given a strict, literal interpretation, it is radically deficient, at least in so far as it is applicable to the existing corporation, in that it fails to condition the surrender of the society's ancient rights, privileges and immunities, and the transfer of its property to a corporation, of essentially different structure, formed under the supplement of 1914, *supra,* upon the consent, signified in some reasonable and effective mode, of the society composed of the *cestuis que trust.* Appropriate action by that body is not made a *sine qua non.* No method is provided for the members' collective or individual action.

But if this section be construed as requiring by implication the requisite consent, and therefore satisfying constitutional demands, or if, assuming the contrary, it be held that appropriate congregational action of approbation, or long continued acquiescence in the proceedings taken by the corporate trustees, would supply the fatal deficiency, the proofs do not establish either assent, express or implied, or estoppel to assert non-assent. There was a failure of due notice indispensable to valid action. The proceedings were largely informal, and did not meet the requirements of the situation. Procedural essentials were disregarded. Notice of the call of the meeting for consideration of the proposal consisted merely of a pulpit announcement of the time and place on three successive Sundays, the last of which was made on the day of the meeting. Furthermore, the evidence discloses that the meeting was held earlier than the time so announced. The resolution of approval was not reduced to writing, and the nature and extent of its terms and provisions are left in doubt. The element of acquiescence is lacking because, concededly, the old form of government continued without change

until 1932, when efforts to organize the corporation, for the first time, in accordance with the certificate filed in 1924 precipitated this litigation. The trustees were elected year after year in consonance with the form and requirements of the old charter.

And the notice of the meeting was otherwise singularly deficient. It was not sufficient to convey to the members of the society the fundamental changes proposed; and it is clear that such notice as was given did not reach all the members of the society in time to permit of their participation in the decision of the matter. While this oral notice was in consonance with custom and usage, and sufficed, it may be conceded, for the conduct of the ordinary business of the society, it was plainly inadequate to bind its membership to the essential alterations claimed to have been thus sanctioned. In the absence of specific provision in the laws of governance, the notice must be of a character reasonably appropriate to the proposed basic change of corporate structure and property rights. This was an extraordinary proposition, of vital importance to the society's membership; and a notice that did not fairly apprise them of the nature of the proposal was essentially defective.

Yet, in holding that the act of 1914, *supra,* was unconstitutional in its entirety, the learned vice-chancellor fell into error. Assuming for present purposes that paragraph 8 of that act is altogether vicious, and therefore invalid *in toto,* it is an independent and separable provision that may be exscinded without affecting the validity of the remainder of the enactment. The primary design of the statute was to provide for the incorporation of "any Ruthenian Catholic Church or congregation now existing or which may hereafter exist." This manifestly includes unincorporated societies, existing or to come into being. The association of persons for religious as opposed to secular purposes, having no regard to the particular mode or manner of constituting or forming the body, answers the description of a religious society. *54 C. J. 7.* Paragraph 8 relates to such religious associations incorporated under another law of the state.

It is elementary that an unconstitutional provision in a statute does not affect the validity of another provision of the enactment, if otherwise valid, unless the two are so intimately connected and dependent upon each other as to raise the presumption that the legislature would not have adopted the one without the other. Where the principal object of the statute is constitutional, and the objectionable feature can be excised without substantial impairment of the general purpose, the statute is operative except in so far as it may contravene fundamental law. *United Stores Realty Co.* v. *Asea, 102 N. J. Eq. 600; State Board of Health* v. *Schwarz Bros. Co., 86 N. J. Law 170; Hudspeth* v. *Swayze, 85 N. J. Law 592, 609; Shultise* v. *O'Neill, 85 N. J. Law 15; Riccio* v. *Hoboken, 69 N. J. Law 649, 661; Johnson* v. *State, 59 N. J. Law 535; State* v. *Kelsey, 44 N. J. Law 1, 29.* This principle is applicable to statutes for the creation of bodies corporate. *14 C. J. 96.* The question is to be considered in the light of the settled principle that a permissible doubt as to validity is to be resolved in favor of the enactment. *United Stores Realty Co.* v. *Asea, supra; State Board of Milk Control* v. *Newark Milk Co., 118 N. J. Eq. 504.*

The main object of the statute under review is plainly a valid exercise of legislative power. The taint of illegality, such as there is, is confined within the limits of paragraph 8, and does not affect in any sense the attainment of the general policy of the act.

While the legality of the existence of a *de facto* corporation may be attacked only by the state in a direct proceeding, by information in the nature of a *quo warranto,* we find that the complainant is not in that category. The instrument relied upon as the charter was signed by the pastor of the existing church and two lay members thereof, together with the Ruthenian bishop and his chancellor; and it was therein certified that it was filed "for the purpose of incorporating said [existent] church." It was so intertwined, in form and substance, with the consent filed by the trustees of the subsisting corporation under paragraph 8 of the cited act as to taint and invalidate the whole proceeding. It was not

designed that both the proposed new corporation and the old have separate and independent beings; the former was to supersede the latter.

We express no opinion on the other points raised and argued, except to say that the proofs adduced do not, as the vice-chancellor seems to have found, satisfy the standard of proof of moral or conscious fraud. Adherence to the old charter after the filing of the new certificate, with the accompanying consent to incorporate under the supplement of 1914, *supra,* is not conclusive of such fraud. In the view we take of the case, there is no need for an analysis of the evidence. Suffice it to say, that the challenged conduct is on the whole consistent with good faith; the testimony was not of such a character as to overcome the presumption of *bona fides.*

The decree is accordingly modified, and, as so modified, affirmed.

*For modification*—THE CHIEF-JUSTICE, PARKER, CASE, BODINE, HEHER, PERSKIE, HETFIELD, DEAR, WELLS, WOLFS-KEIL, RAFFERTY, JJ. 11.