BRADLEY *et al. v.* CITY OF JACKSON.[*]

(En Banc. October 22, 1928. Suggestion of Error Overruled Dec. 10, 1928.)

[119 So. 811. No. 27188.]

*Corpus Juris-Cyc References: Municipal Corporations, 43CJ, section 229, p. 229, n. 70; section 315, p. 300, n. 94; section 1701, p. 922, n. 19; section 1702, p. 926, n. 28; section 1713, p. 936, n. 31; section 1717, p. 940, n. 80; section 1991, p. 1218, n. 86; As to liability of municipal corporation for negligence of officers or servants in performance of governmental functions see annotation in 10 A. L. R. 480; 32 A. L. R. 981; 47 A. L. R. 816; 19 R. C. L. 1107; 3 R. C. L. Supp. 995; 4 R. C. L. Supp. 1308; 5 R. C. L. Supp. 1058; 6 R. C. L. Supp. 1158; 7 R. C. L. Supp. 652.

*Robertson & Campbell* and *Ross R. Barnett,* for appellants.

140

*Morse & Bryan,* for appellee.

Argued orally by *Ross R. Barnett* and *Stokes V. Robertson,* for appellant, and *W. E. Morse,* for appellee.

148

152

ANDERSON, J., after stating the case as above, delivered the opinion of the court.

A municipality, in the exercise of its police powers, acts in a governmental and not in a private capacity, and is not liable for torts committed by its officers and agents in attempting to carry out and enforce its ordinances and other regulations adopted by it in pursuance of such powers. *City of Gulfport* v. *Shepperd*, 116 Miss. 439, 77 So. 193; *Alexander* v. *Vicksburg,* 68 Miss. 564, 10 So. 62; McQuillin on Municipal Corporations (2 Ed.), vol. 6, sec. 2630.

It is sometimes difficult to determine in the particular case under consideration whether the municipality has acted in its governmental or in its private capacity. A municipality, in the exercise of its governmental or police powers, is clothed with a part of the sovereignty of the state; it is one of the state's governmental agencies. In the exercise of its nongovernmental or private powers, the municipality stands as an individual or private corporation, so far as its acts are concerned. McQuillin on Municipal Corporations (2 Ed.), vol. 6, sec. 2625.

Among the police powers conferred on municipalities by our code chapter on the subject, section 3329, Code of 1906, as amended by chapter 274, Laws of 1926, Hemingway's Code of 1927, section 6765, provides as follows:

"To make all needful police regulations necessary for the preservation of good order and the peace of the mu-

nicipality; and to prevent injury to, destruction of, or interference with public or private property; and to adopt ordinances prohibiting within the corporate limits the commission of any act which amounts to a misdemeanor under the laws of the state.''

In the establishment and regulation of schools, hospitals, poorhouses, fire departments, police departments, jails, workhouses, and police stations, municipalities act in their governmental capacity. There seems to be practically no conflict in the authorities to that effect; and it also appears from the authorities to be equally well settled that municipalities, in the adoption and enforcement of ordinances and regulations for the prevention of the destruction of property by fire or flood, and the manner and the character of the construction of buildings, act in their governmental capacity, and not in their private capacity. McQuillin on Municipal Corporations (2 Ed.), vol. 6, section 2625; *Id.*, vol. 3, section 1918. All such ordinances and regulations, however, must be reasonable, otherwise they will be void and nonenforceable; and the question of their reasonableness is a judicial question.

Applying the rule of pleading to appellants' declaration, that a pleading must be most strongly construed against the pleader, the case made is this: Town Creek runs through the municipal limits of appellee in a southerly direction. There have been disastrous floods from this creek, destroying and damaging much property in the limits of the municipality. In order to prevent a recurrence of such floods, and the consequences thereof, appellee acquired by purchase and eminent domain proceedings a part of the bed of the channel of the creek, and thereafter straightened the flow of its waters by means of an artificial channel. After so doing, appellee sold and conveyed parts of the bed of the channel to several purchasers, among them Mrs. Annie Stone Odeneal, the predecessor in title of J. H. and Virgil Howie to the lot on which appellants were constructing the building

in question, with the reservation in its conveyances, of a perpetual easement in the property, as shown by Exhibit E to appellants' declaration, copied above in the statement of the case. And in order to facilitate the free flow of the waters of Town Creek through the artificial channel, and thereby prevent its overflow, and a recurrence of the destruction and damage to property in the municipality, appellee reserved in such conveyances, including that to Mrs. Stone, under which the Howies claim title, the right to direct and control the manner of the construction of the piers to any building erected over the bed of the channel. And it is also fairly inferable from the declaration that appellee had another purpose in making such reservation, namely, to insure the public safety by requiring buildings erected over the channel to be constructed in a permanent and stable manner.

Taking the averments of appellants' declaration in connection with the reservation in appellee's conveyance of the Howie lot, we think it plain that in the doing of the acts complained of appellee was attempting to prevent the destruction of property in the municipality by floods from Town Creek, and also to insure the public safety by prescribing the manner in which buildings should be constructed over the artificial channel of the creek. Therefore, under the law, appellee, in the doing of such acts, was acting in its governmental and not in its private capacity, and is not liable for the torts of its officers and agents in carrying out its purposes.

And, furthermore, we are of opinion that the judgment of the court was justified upon another ground, namely, the declaration shows that when the officers and employees of appellee made the alleged unlawful demand upon appellants that the building be constructed in a certain manner, appellants yielded to such demand without being forced by appellee to do so. It is true the declaration alleges in general terms that appellee's officers and agents forcibly took charge of the construction

of the piers placed in the artificial channel of the creek; but construing the declaration as a whole, and most strongly against the pleader, it shows that appellee's officers and agents, in doing the acts complained of, used no force whatever. The declaration sets out in detail what appellee's agents and officers did and said, which amounts to no more than this: They demanded that appellants do the work in a certain manner, and to those demands appellants yielded. The declaration does not allege that any force or threats were used that would amount to an invasion or breach of appellants' legal rights. Appellants did not have to yield to the demands of appellee's officers and agents, if such demands were without authority of law. They should have stood on their rights, and, if necessary, tested them in the courts. Appellants were under no more obligation to yield to the demands of appellee, if such demands were unlawful, than one private individual would be obligated to yield to the unlawful demands of another private individual.

*Affirmed.*

ETHRIDGE, PACK, and COOK, JJ., dissenting.

ETHRIDGE, J. I dissent from the opinion of the majority on both of the grounds therein set forth for the affirmance of this case.

It appears clear to me that the city was proceeding upon the theory that it had a right to superintend the construction of the piers in the watercourse provided for in its contract; and the declaration clearly makes a case, in my opinion, of that theory; and if the city was, in fact, undertaking to act on any theory that it had a governmental right so to do, independent of Exhibit E, it would devolve upon the city to set that up by plea, as the declaration as finally amended did not set forth any allegations which would bring the case within such theory. I will, therefore, first discuss the theory set forth in the last ground of the opinion.

The declaration charges that the authorized city inspectors, —— Ewing and —— Wells, and the city engineer, Peter O'Brien, acting for and on behalf of the city of Jackson, claiming to have the right to direct plaintiffs as to the manner of the construction of the said building, objected to the manner in which said building was being erected; and absolutely demanded that the said plaintiffs change their plan or method of pouring concrete and various of their other plans and methods in erecting said building; that the said plaintiffs objected to and protested against the orders given by the city of Jackson, through its said duly authorized agents and inspector, but notwithstanding their objections, the said city, through its duly authorized agents and inspector, forcibly took charge of the erection of said building, and absolutely demanded that the said plaintiffs and their employees proceed with the erection of said building in conformity with and under their direction and leadership; that the said plaintiffs were compelled to comply with the said city's orders, through its duly authorized agents and inspector, and commanded to work under their supervision.

It is then set forth that the city of Jackson, through its duly authorized agents and inspector, was grossly negligent and wholly unskillful in erecting said building, and that as a direct proximate cause of the gross, wanton, reckless, and willful negligence of the city of Jackson, through its duly authorized agents and inspector, they have suffered great loss.

The declaration sets forth, in detail, the particulars in which they were directed and controlled by the said city engineer and agent.

By reference to the contract between the city and the grantee, Mrs. Odeneal, through whom the owners of the building, Howie & Howie, acquired title, it will be observed that the property here involved was conveyed to the said grantee by adequate description, but that the

grantors reserved a perpetual easement on and over the therein described property for the passage of water with the perpetual right of the city of Jackson to go into said drain for the purpose of inspecting it, or to clear it of washed-in or washed-down obstructions of all kinds, and of deepening the channel and of concreting the bottom of same, the said deepening and/or concreting the bottom of same not to put the property holder or holders to any additional pier expense for the then existing piers. It then recites:

"The easement hereinbefore reserved by the city of Jackson for the passage of water is subject to the perpetual right of the grantee herein and/or his successors in title whenever desired or convenient, to build piers in said drain of such size as may be deemed necessary by the grantee and/or his successors in title, to support any structure or structures which he or they may, at any time, erect or construct, such piers to be not thicker at the top from east to west than eighteen inches and said piers to run in lines not closer from east to west than fifteen feet in the clear, in a general north and south direction, paralleling in general the flow of water across the above-described property."

And the city further granted to the grantee, and/or his successors in title, all continuing rights to run with said property, the rights and permissions to join any structure or structures which he, or his successors in title, might, at any time, erect upon the property abutting the bridge which lies along the same, and adjoining the property. The provisions of the deed are fully set forth in the majority opinion, and it is clear to my mind that the city was undertaking, under the contract rights reserved in this deed, to dictate not only the kind and size of the piers to be erected, but how the concrete should be poured and mixed, which rights were clearly not given in the reservations granted in the deed.

Under no stretch of the rules of construction can such right be upheld. But as the city assumed it had such rights, and undertook to control the contractors in a particular which it had no right to do, it was clearly acting without the right; and a municipality is liable for its torts to the same extent as an individual, except in cases falling within its governmental capacity.

It is clear to my mind that if an individual grantor had done what the city of Jackson did, in the present case —had unlawfully and willfully interfered with the plaintiffs in their rights—he could not escape liability on the theory that he was doing an unlawful thing. The plaintiffs were not, in my opinion, under obligation to forcibly resist the city's orders. A person cannot take two such inconsistent positions. If I interfere with a man's enjoyment of his property, claiming I have a right to do so, and the party, through fear, or dread of lawsuits, or coercion of any kind, yields to my unlawful and willful demands, he is clearly entitled to a right of action against me although he might be justified in standing up and fighting for his rights.

It appears to me to be a strange doctrine that a municipality, which is armed with certain powers, can go in and interfere with private rights, and escape the consequences of its unlawful intermeddling and wrongs.

The declaration charges the agents were duly authorized to do what they did. The city in its corporate capacity is, therefore, responsible for their acts. It has the same responsibility that an individual has, and this case, as I see it, is not one wherein governmental agents exceed their lawful authority, but is clearly a case in which the city is acting in a private, personal capacity.

It is clear to my mind that the action of the city cannot be justified in its intermeddling with the construction of the piers under any claim that it was exercising its governmental functions. The best definition I have

found upon the subject is contained in 28 Cyc., pages 267 to 269, drawing the distinctions between governmental functions and municipal functions:

"b. Governmental Functions. This class of functions includes all those which are usually performed by the state in rural communities under general laws, and were so performed within the municipal boundaries before the organization of the corporation, and which the state would resume on disincorporation. These functions are served by the police power and power of eminent domain; and also by those promoting public education, those maintaining and operating a fire department, those furthering the administration of justice, and such other powers as are to be exercised by the corporation for the public weal, in or for the exercise of which the municipality receives no compensation or particular benefit. This class of functions are not franchises or privileges, to be exercised or ignored by the municipality at discretion, but rather legal duties imposed by the state upon its creature, which it may not omit with impunity but must perform at its peril. They may be imposed in the charter or by general laws, which the corporation must obey, as must any natural person, or suffer the consequences of violated law. They cannot be indicted for offenses which derive their criminality from evil intention, or from breach of social duty, pertaining to human beings; nor can they be guilty of treason, felony, or offenses against the person, or be imprisoned; but they may be indicted and suffer fine or penalty under judicial sentence; and in some states even forfeiture of charter, for omission to perform governmental duty imposed by law. These governmental functions are of comparatively recent imposition upon municipalities, being nearly or quite all the development of the nineteenth century. They are all imposed by statute, and are necessarily mandatory or peremptory functions, and subject to increase or diminution at the pleasure of the state. In the performance of governmental

duties the municipality represents the state, uses its power, and is often permitted to use its name. The officers performing these duties and exercising these powers are rather officers of the state than of the municipality, and as such are liable to state control. Accordingly it has been repeatedly held by the courts that the state may create and appoint officers for the performance of these governmental functions, such as fire and police commissions, and even city hall commissions. And in the functions of taxation, administration of justice, and enforcement of the criminal law, the state often operates through the media of its own general officers, within as well as without the municipal boundaries. Whether the function of caring for and keeping in repair the public highways within the municipality is governmental or municipal has been often mooted and diversely decided."

"c. Municipal Functions—(I) In General. All functions of a municipal corporation, not governmental, are strictly municipal. They are sometimes called private, just as the governmental are called public; but this terminology is unfortunate, since all municipal functions are public, as pertaining to the public nature of the corporation. Under this class of functions are included, in most jurisdictions, the proper care of streets and alleys, parks, and other public places, and the erection and maintenance of public utilities and improvements generally. Logically all those are strictly municipal functions which specially and peculiarly promote the comfort, convenience, safety, and happiness of the citizens of the municipality, rather than the welfare of the general public. This class of functions was almost the sole possession of the English municipalities before the nineteenth century, and were called municipal franchises, by which was generally understood royal privileges granted to a municipality, and not duties imposed upon it. Under modern judicial opinion, however, this kind of functions is properly divisible into two classes—imperative and

discretionary. The use of municipal powers to furnish public utilities to citizens for hire does not make the municipality a private corporation.

"(II) Imperative Functions. Imperative functions, often called 'mandatory,' are such as the state has imposed upon the municipality, and may compel it to perform under legal penalty. The state, leaving no option to the corporation, has enacted by its legislature that the act is proper and must be done; wherefore the municipality may not refuse or abdicate this function with impunity. It must proceed to perform the duty or take legal consequences for its dereliction. Usually the mandatory functions are imposed by words of imperative form or signification, as 'shall' or 'must,' in the charter or statute; but sometimes, especially when the means are supplied, or the public is specially interested in the performance of the act, the words 'hereby authorized,' or 'shall be lawful,' or 'may,' have been construed to create a mandatory duty. Proper maintenance and care of streets and alleys is held to be an imperative function, whether treated as municipal or governmental. So also of sewers and other public utilities, after they are established, even though the improvement is in limine purely discretionary.

"(III) Discretionary Functions. All other than imperative duties are discretionary functions of the municipality. This class embraces nearly or quite all matters of improvement. Before the work is contracted for the municipality is at liberty to undertake it or ignore it; it is a matter of legislative discretion, and not subject to judicial supervision. After a contract for improvements is made, the discretion is subject to the terms of the contract. After the work is completed, its proper maintenance and repair is henceforth imperative."

There is no statute in this state which authorizes a city to prescribe the details of the work of mixing concrete for piers, or of any other work going into the de-

tails thereof. Indeed, it would not be permissible for the statute to authorize the city to undertake the details of construction work or private property.; this would infringe upon the right of the citizen. The utmost that the city can go, in such matters, is to prescribe rules and regulations governing such matters. And there is nothing in this record to show that there is any ordinance undertaking or claiming the right of the city to so act. .

It will be noticed from the definition above set out that governmental functions are only those which the city must perform at all hazards, and as to which it may not have discretion. In other words, it is such acts as the city must do, and cannot refrain from doing without violating the law of the state. The state has never undertaken to regulate and control the details of construction work in erecting buildings.

I do not see how, in view of the authorities, the act of the city can be justified at all. No statute gives any such power to the city, to say nothing of compelling it to do so.

All functions of a municipal corporation, not governmental, are strictly municipal. The city performs many acts under statutory powers which fall within the classification of municipal functions. Indeed, it is the statute or charter which gives it the right to perform its functions and exercise its powers in its municipal nature. The state has certainly imposed no duties upon any of the cities to direct the construction of buildings, mixing of concrete, or the setting of forms, the laying of brick, driving of nails, the sawing of lumber, or any other similar functions. It may be that the city is pledged to perform certain functions, and still such functions not be governmental functions, as shown in the above citation from Cyc. In other words, certain of its municipal functions are mandatory, but they are not such functions as are imposed for the purpose of the general welfare

of the people of the state, but are such as pertain only to the municipality and its people.

The city, in reserving the right to keep the channel of the stream clear of obstructions, and to remove them, and in its contract limiting the construction of piers, is in no wise interfered with by mixing the concrete, and the method used in pouring same into the forms for the piers set in the said channel.

In the case of *Byrnes* v. *City of Jackson,* 140 Miss. 656, 105 So. 861, 42 A. L. R. 254, is set forth the conflicting line of authorities as to what constitutes governmental functions; and in that case it was held that the operation of a zoo for the amusement and instruction of the people was not a governmental function. And, according to the authorities we followed in that case, the functions claimed in the majority opinion to be governmental functions are not such, but are municipal functions, being the mere exercise of privileges rather than statutory duties for the general public welfare. *Crawford* v. *D'Lo,* 119 Miss. 28, 80 So. 377; *Brown* v. *Vicksburg,* 108 Miss. 510, 66 So. 983; *Semple* v. *Vicksburg,* 62 Miss. 63, 52 Am. Rep. 181, illustrate the principles as to what is governmental and what is municipal functions. See also 43 C. J. 183; *City of Denver* v. *Davis,* 37 Colo. 370, 86 Pac. 1027, 6 L. R. A. (N. S.) 1013, 119 Am. St. Rep., 293, 11 Ann. Cas. 187.

In the case of *South Carolina* v. *U. S.,* 199 U. S. 437, 26 S. Ct. 110, 59 L. Ed. 261, 4 Ann. Cas. 737, the United States supreme court held that the state of South Carolina, while engaged in the liquor business under its dispensary system, was engaged in it in its corporate capacity, and not in its governmental capacity, and was subject to the privilege tax imposed on selling liquor by the United States government.

It follows from these views that I think the case should be reversed, and the cause remanded for a new trial.

PACK and COOK, JJ., concur.