BALLARD, MAYOR, ETC., et al. *v.* SMITH

No. 40901 December 8, 1958 107 So. 2d 580

532

534

*C. R. Bolton, Sam E. Lumpkin,* Tupelo, for appellants.

*Adams, Long & Adams,* Tupelo, for appellee.

536

McGEHEE, C. J.

This case involves the validity of certain zoning ordinances of the City of Tupelo, Mississippi, with reference to procedure and methods followed in their adoption, and, if they are valid, then the validity of their application to appellee, D. D. Smith, who obtained an injunction against their enforcement.

The appellee brought this suit in the Chancery Court of Lee County against the City of Tupelo, its Mayor Ballard and Chief of Police Monaghan, seeking to enjoin them from successive prosecutions and convictions of him in the city police court on charges of violating the city zoning ordinance by the operation of a gasoline filling station. The two city zoning ordinances in question were enacted in 1946 and in 1953, respectively.

After a lengthy hearing, the chancery court permanently enjoined the appellants from prosecuting complainant under the city zoning ordinances, on the ground that they were both void. From that decree this appeal was taken.

I.

The chancery court held that the 1953 zoning ordinance was invalid because the minutes of the Mayor and Board of Aldermen for the period when it was enacted were not signed by the Mayor and attested by the City Clerk. We agree with that conclusion. Miss. Code 1942, Recompiled, Sec. 3374-97, makes it the duty of the city clerk to keep the municipal minutes, in which "he shall record the proceedings and all orders, ordinances and judgments of the govering authorities, and to keep the same fully indexed alphabetically, so that all entries on said minutes can be easily found. All official actions of the governing authorities of a municipality shall be evidenced only by official entries duly recorded on such minute book."

Section 3374-75, Code of 1942, requires the municipal clerk to keep an ordinance book. Prior to the amendment by the Laws of 1950, Chapter 491, Section 75, the predecessor statute, Section 3656, Mississippi Code of 1942, provided likewise for an ordinance book. The 1950 amendment, however, set forth in Section 3374-75, provided in some detail for the recording of ordinances in the ordinance book. The amendment further stated that the clerk shall keep municipal minutes in which he must record the proceedings as to all orders and judgments of the city. The 1950 amendment then added the following provision:

"Said clerk shall likewise record in said minute book all ordinances in full, or in lieu thereof, the title of all ordinances, in each of which instance, the ordinances in full shall be recorded in the ordinance book provided for in Section 1 hereof. In the event only the titles of ordinances are recorded in the minute book, it shall be necessary that the ordinance in full, after recordation in the ordinance book, shall be read and verified and subscribed to by the mayor and clerk at a regular meeting of the governing authority of the municipality in the same manner required by law for the reading, verification of and subscription to minutes of said municipality."

These 1950 amendments to the municipal laws of the state manifest a legislative intent that the city clerk shall keep municipal minutes which record the proceedings as to all orders and judgments of the governing authority of the municipality; and that the minutes shall be read, verified and subscribed by the mayor and clerk. The quoted amendment of 1950 states indirectly what could have been stated directly, but it evidences the legislative intent that the mayor and clerk shall sign and attest the minutes of the governing authority of the city. It is undisputed that this was not done during the period when the 1953 ordinance was enacted. Failure to comply with this mandatory legislative requirement invalidates

the 1953 zoning ordinance. Since this conclusion is applicable to the 1953 ordinance, it is not necessary for us to consider the other grounds of objection thereto.

## II.

Since the 1953 zoning ordinance was invalid, it did not repeal the City of Tupelo's zoning ordinance of August 6, 1946. Hence the next issue is whether the 1946 zoning ordinance was validly enacted and in effect and applicable to appellee Smith. The chancery court held that it was duly and legally adopted by the mayor and board of aldermen, but that, when Smith installed his gasoline pumps at his filling station, the zoning use map which was referred to in the ordinance was not available to Smith or to the public, had been lost and was not found until after this controversy arose; that the zoning map did not conform to the ordinance; that for those reasons, and because the zones set forth in the map were unavailable to Smith for his inspection and were, therefore, not notice to him, the 1946 ordinance was invalid at least as to Smith in the construction of his filling station.

The ordinance itself did not define the zones. Section 1 thereof stated that the city was divided "as shown by the zoning map, dated August 5, 1946, and filed in the office of the city clerk * * * said map and all the notations, references, and other things shown thereon shall be as much a part of this ordinance as if the matters and things set forth by said map were all fully described herein."

Although there is a procedural defect in the proceedings of the board enacting the ordinance, we do not think it has the effect of invalidating it. Hawkins v. City of West Point, 200 Miss. 616, 27 So. 2d 549 (1946); Walker v. City of Biloxi, 92 So. 2d 227 (Miss. 1957).

The undisputed evidence also reflects that the map offered in evidence as the city's exhibit, dated August 6, 1946, is the zoning map referred to in the 1946 ordinance. The zoning statutes in effect in 1946 did not

provide for a method of verification of a municipal zoning use map. Miss. Code of 1942, Sections 3590-3597. It is well-established that a zoning map may be incorporated in a zoning ordinance by reference to it. 58 Am. Jur., Zoning, Section 32; 1 Yokley, Zoning Law and Practice (2d Ed. 1953), Sections 44, 71; 62 C. J. S., Municipal Corporations, Section 427, pp. 819-820, Section 226, pp. 464, 465; 8 McQuillin, Municipal Corporations (3rd Rev. Ed. 1957), Section 25.89.

The map itself is amply identified as the use map under the 1946 ordinance. The four zones, industrial, residential, general business, and local business, are in different colors. The corporate limits are defined by a red colored line. Under a legend on the map describing the colors for each zone is written in longhand, "this the 6th day of August, 1946," and under that is the signature of the then mayor and the attestation of the then city clerk. Following are the words "Tupelo, Mississippi," and "Tupelo City Planning Committee," with a distance scale in feet. The witnesses undisputedly identified this map as being the 1946 zoning map.

The only inconsistency in this connection arises from the quoted statement in the ordinance referring to the map "dated August 5, 1946," whereas the handwritten date on the map itself above the signatures of the mayor and city clerk is August 6, 1946. It is manifest that this is a mere clerical error; that this was the only zoning map under the 1946 ordinance, and the great weight of the evidence verifies that fact. Hence we think that the zoning map in evidence dated 1946 is amply shown to be the one pertaining to the 1946 zoning ordinance, and in conformity therewith. City of Newburyport v. Thurlow, 324 Mass. 40, 84 N. E. 2d 450 (1949); Auditorium, Inc. v. Board of Adjustment, 47 Del. 373, 91 A. 2d 528 (1952).

After the 1953 zoning ordinance was passed by the board, a new zoning map was made and placed on dis-

play in the office of the city tax assessor. It was hung on the wall in that office. With the new map in use under what the city authorities assumed was the valid 1953 zoning ordinance, the 1946 zoning map was filed away, apparently being turned over to W. J. Conway, city building inspector. After this suit was filed by Smith, the map was found and introduced in evidence.

W. J. Conway, city building inspector, said that after the search began for the 1946 map, Leland Cook, apparently a surveyor, advised him that he had placed the map in the Mayor's office; that he, Conway, found it in that office after considerable search, in an unexpected place; that he then placed the map in a frame and hung it up in the city hall the next morning. His reason for this was evidently because the validity of the 1953 ordinance was then under attack, and the usefulness of the 1953 map was in question.

■■ There have been several cases involving situations where use maps referred to by zoning ordinances have been lost, misplaced or not prepared at all. Where such maps were not properly filed, or made available for public inspection, it has been held that application of particular zoning regulations was invalid because of lack of definiteness of description and location. Anno., 39 A. L. R. 2d 766, 772-773 (1955). However, the circumstances here take this case out of the cited rule. In the first place, the 1946 map was in fact made, filed, and kept as a public record during the period from 1946 until enactment of the 1953 zoning ordinance, which later ordinance the city authorities assumed to be valid. In other words, the 1946 ordinance went into effect with a proper map on public record, but it was filed away after the invalid 1953 ordinance was passed, which the city authorities assumed was valid. We do not think that a zoning ordinance once effective can be repealed by the filing away or misplacement of the use map, where this occurred after

an invalid but presumptively valid ordinance had been passed superseding the prior zoning ordinance.

More importantly, appellee Smith was not misled in any respect as to the classification of the zone in which his property was located. It is undisputed that it was classified as "local business zone" in both the 1946 and 1953 ordinances. Smith had a 10-year lease on his corner lot, tore down a wooden structure used as his store, and erected a brick and tile building for his store. The controversy arose because he then desired to place in the front of his store gasoline tanks and meters for the sale of gasoline. He then knew that both of the ordinances prohibited filling stations in a local business zone without a special permit. He applied for a permit but his application was refused by the board. So he was well aware of the fact that both zoning ordinances prohibited construction of a filling station in a local business area, but he apparently determined to ignore the ordinance and construct his filling station anyway.

 In other words, he cannot complain that the map was filed away and temporarily misplaced, because he had actual notice that his property was zoned "local business", and with such notice he applied for and was refused a permit for a gasoline filling station in that zone.

Bolduc v. Pinkman, 148 Me. 17, 88 Atl. 2d 817 (1952) is pertinent. There plaintiff purchased land for a bakery, but it was classified in a residential zone. He sought to enjoin the building inspector of the city from enforcing the ordinance against him, because allegedly the map did not sufficiently define the limits of the zones. He had previously filed an application for a building permit, which disclosed his knowledge that his property was in a residential zone. His application was denied by the city board. In denying plaintiff relief, the court said that whatever the facts were with reference to the inadequacy or loss of the map, the plaintiff is not in ignor-

ance, as he alleges, in effect, about the location of his property with reference to the pertinent zone lines. He had alleged in his bill that no zoning map was on file at the time of enactment of the ordinance or at the present time. But his knowledge that his property was in a residential zone barred him from asserting invalidity of the ordinance for lack of notice.

1 Yokley, supra, Section 44, interprets Bolduc v. Pinkham, supra, as follows: ''The Supreme Judicial Court of Maine has held that where a zoning ordinance prohibited the operation of a bakery business in a residential zone, and the baker's application for a building permit to construct a bakery building disclosed his knowledge that the property was in such zone and alleged that the building would be adapted to zoning requirements, the zoning ordinance would not be held invalid because of the non-existence of the map referred to in the ordinance.''

■■■ The purpose of a zoning use map is, of course, to give notice to the property owners in the municipality of their zone classifications. It is undisputed that Smith had actual notice of his property zone classification. Moreover, the 1946 ordinance had a valid use map and in good faith it was filed away by the city after a purportedly valid 1953 zoning ordinance was passed. Its temporary loss or misplacement does not invalidate the 1946 ordinance. And Smith cannot complain of lack of notice of his zone, when in fact he knew its classification and applied for an exception to it, which was denied.

## III.

Since the 1946 zoning ordinance is valid and applicable to appellee's property, the final question is whether, as applied to him by the city authorities, it is so arbitrary, unreasonable and discriminatory as to constitute a violation of the due process clauses of the State and Federal Constitutions. The chancery court held that the

1946 ordinance prohibited gasoline filling stations in all areas except industrial zones; that a number of stations were already located in the local business zone, and that the refusal of the board to permit appellee to construct a filling station in such zone was, therefore, arbitrary and discriminatory, since the effect of such ruling would be to keep out competition for those filling stations already located in local business zones. So the trial court permanently enjoined enforcement of the ordinance as to appellee.

Main Street in the City of Tupelo runs east and west. Park Street runs north and south, and bisects Main Street at a right angle. Smith's lot is located on the northeast corner of this intersection, and his business faces on Main Street. His property is located upon the southwest corner of Block 15, which is traversed diagonally by the right of way of the St. Louis & San Francisco Railway, which begins on the southeast corner of the block and, running in a northwesterly direction, leaves the block a short distance below the northwest corner thereof. There is a stipulation in the record as to the development of other lots in the vicinity on Main Street and on the intersecting north and south streets. Smith's lot is on the southwest corner of the block, and on the opposite corner is a used-car, sales lot. Across the street from appellee's property is a vacant lot, and to the east thereof, a flower shop and two residences, and to the west of that, four or five store buildings.

Park Street, running north and south, is to the west of Block 15, and Gloster Street is to the east. The railroad crossing runs approximately through the intersection of Main Street and Gloster Street. There is a filling station on the southwest corner of Main and Gloster, another filling station on the southeast corner facing Gloster Street, and on the northeast corner of that intersecting another filling station. On Gloster Street just north of the railroad is another filling station. On Glos-

ter Street to the south of Main Street is a restaurant and a motor company which contains a garage, sales business, and filling station. There are other businesses in this local business zone. The stipulation states that "scattered up and down the Main Street" are "several filling stations at various and sundry corners on the street," but does not indicate how far they are from appellee's lot. Main Street bisects the city from the west and to the east end. Gloster Street is also U. S. Highway No. 45. Main Street, running west, is four-lane State Highway No. 6. The record reflects that this intersection carries a very heavy volume of traffic.

Alderman Gus Ballard testified that there was continual traffic from the highways at this point, and during certain periods of the day there was a heavy load of local traffic from nearby factories, as well as from people coming into town to work. The railroad traffic also creates a problem at this point. The entire picture created "quite a traffic problem for the City of Tupelo to handle." The railroad coming through the area diagonally blocks traffic going in all four directions.

Alderman C. C. Eason testified to substantially the same effect.

Appellee Smith himself testified that three highways come together in this area and that there is a large amount of traffic; that the railroad cuts across the block. O. B. Shotts, who lives across the street from the property, admitted that there was heavy traffic coming through the area.

Mayor James L. Ballard testified that the location of an additional filling station on this property creates "a traffic hazard"; that the four filling stations on the corner or near it have been in those locations for a number of years "before this highway was there."

The 1946 ordinance classifies appellee's property as local business, and prohibits in Section 3 the construction of a gasoline filling station in such zone. Section 7

and subsections (g) and (h) authorize the Mayor and Board of Aldermen to authorize a variation from the zoning rule in cases of "exceptional hardship", and "only where such relief can be granted without injury to the public interest."

As previously stated, appellee had applied for a variation and the application was denied. He did not appeal from that denial, as authorized by Code Section 1195.

The pertinent tests in a judicial review of municipal actions under zoning ordinances are set forth in Holcomb v. City of Clarksdale, 217 Miss. 892, 65 So. 2d 281 (1953). Complainant there sought to have declared invalid a zoning ordinance insofar as it restricted use of his property to residential purposes. He wanted it classified as commercial, for an apartment house. This Court affirmed dismissal of the bill and upheld the action of the city authorities. Laying down the basic principles, the Court said that the classification of property for zoning is a legislative rather than a judicial matter, "as are the size, extent, and boundaries of zones." The courts generally will not interfere in such matters or substitute their own judgment for that of the municipality, although zoning is subject to judicial review "as to whether it is reasonable, arbitrary, discriminatory, confiscatory or an abuse of discretion. The Court will not set aside the municipality's classification if its validity is fairly debatable, but will do so only after its invalidity is clear."

It was further said in *Holcomb* that all presumptions must be indulged in favor of the validity of zoning ordinances. It is presumed to be reasonable and for the public good. It is presumed that the legislative body investigated it and found conditions such that the action which it took was appropriate. The one assailing the validity has the burden of proof to establish that the ordinance is invalid or arbitrary or unreasonable as to

his property, and this must be by clear and convincing evidence.

There has been a large amount of litigation and many cases dealing with the zoning of gasoline filling stations. Two Mississippi cases pertain to this business. In Dart v. City of Gulfport, 147 Miss. 534, 113 So. 441 (1927), the city proceeded under the original zoning act, Mississippi Laws 1924, Chapter 195. Subsequently, in 1926, 1938 and 1946 the act was changed in several respects. Dart had obtained a city permit to erect a filling station, and while he was proceeding with preliminary work, the city passed an ordinance prohibiting the erection of a filling station in certain zones, which included that embracing his property. It then revoked his permit. Dart filed an action in chancery court to have the ordinance declared void as to his property. Testimony showed that there was a congested traffic area near this property. In rendering a decree for complainant, appellant, the court held that the zoning law did not give a city the power to absolutely prohibit the erection of a filling station upon an owner's property, but only the power to regulate and restrict. The ordinance assumed to prohibit the erection in this zone, and this exceeded the municipality's statutory authority. Hence the ordinance was held to be invalid for this reason.

A comparison of Laws of 1926, Chapter 308, with the zoning statutes in effect in 1946 reveals very little difference, except in Code 1942, Section 3590.

However, the decision in the Dart case has since been considerably modified. In City of Jackson v. McPherson, 162 Miss. 164, 138 So. 604 (1932), McPherson applied to the City of Jackson for a permit to erect a filling station on the southeast corner of the intersection of North State and Carlisle Streets. The lot was zoned as residential. The City refused the permit and was affirmed on appeal. The Court considered the reasons for zoning, and held they were sound and necessary in modern

urban centers; that this classification was not arbitrary or unreasonable. The decision was En Banc with Judge George Ethridge dissenting. Neither opinion cited Dart v. City of Gulfport. Since the *McPherson* case, there have been several decisions upholding municipal zoning and prohibition of certain types of construction in certain use zones. Walker v. City of Biloxi, 92 So. 2d 227 (Miss. 1957); Palazzola v. City of Gulfport, 211 Miss. 737, 52 So. 2d 611 (1951); City of Gulfport v. Daniels, 97 So. 2d 218 (Miss. 1957); City of Pontotoc v. White, 93 So. 2d 852 (Miss. 1957). But see City of Hattiesburg v. Pittman, 102 So. 352; Jones v. Hattiesburg, 207 Miss. 491, 42 So. 2d 717. The Dart case has not been followed since the McPherson decision, insofar as it held that a municipality had no power to prohibit certain types of construction or business in designated zones. However, the court has retained judicial review over zoning actions, as outlined in Holcomb v. City of Clarksdale.

 Many authorities have discussed the numerous cases dealing with the zoning of gasoline filling stations. The substance of the decisions is that such filling stations involve highly inflammable commodities and affect the flow and hazards of traffic. The city authorities may take these and other circumstances into consideration in determining proper zoning for filling stations.

8 McQuillin, Municipal Corporations, Section 25.178, p. 441, et seq. says: "Regulation may be directed, in the interest of public safety, to the end of preventing too many filling stations in a small area. A court cannot close its eyes to the fact that a multiplication of filling stations in a comparatively small locality increases the danger to the public notwithstanding the care and caution with which the business may be conducted * * * Considerations that govern the grant or denial of special permits, variances or exceptions as to filling stations embrace among others the following: Danger of fire and explosion; surrounding property; traffic; number of fill-

ing stations in vicinity; hazard to school children; unnecessary hardship; and substantial justice. It has been observed that the safety of the public is the ultimate and controlling consideration." Hoffman v. Mayor and City Council of Baltimore, 187 Md. 593, 51 Atl. 2d 269. See also Ibid. p. 452, footnotes 12 and 13; 62 C. J. S., Municipal Corporations, Section 227 (15), pp. 549-550, 24 Am. Jur., Gasoline Filling Stations, Sections 10, 11; Annotations, 42 A. L. R. 978, 49 A. L. R. 767, 55 A. L. R. 256, 79 A. L. R. 918.

9 McQuillin, Municipal Corporations, Section 26.114, p. 239, states: "The grant or denial of a filling station license or permit may be governed by various considerations, including the following: zoning; proximity to schools, churches, theaters, other buildings where people meet, or other filling stations; and, somewhat more generally, public convenience, welfare and safety. The refusal to grant a permit for the construction of a filling station in a congested business district is proper." Dickinson v. Inhabitants of City of Plainfield, 122 N. J. L. 63, 4 Atl. 2d 91.

In Mrowka v. Board of Zoning Appeals of Town of Plainville, 134 Conn. 149, 55 Atl. 2d 909, it was held that members of a board of zoning appeals are entitled to regard facts learned by them from personal observation of location, traffic and surrounding conditions in considering and denying application for certificate of approval for location of gasoline stations.

In 8 McQuillin, Ibid., p. 452, footnote 13, it is said: "Zoning regulation excluding gasoline service stations cannot be varied as for unnecessary hardship on theory that other gasoline service stations were situated nearby and traffic congestion would be relieved by corresponding establishment across the street. Young Women's Hebrew Association v. Board of Standards and Appeals of New York, 266 N. Y. 270, 194 N. E. 751, reversing 242 App. Div. 626, 271 N. Y. S. 1104."

In Ballard v. Roth, 141 Misc. 319, 253 N. Y. Supp. 6 (1931), it was held that the fact there were numerous other gasoline stations within the marked district, eight of which were within two city blocks of the proposed location in question, in nowise helped petitioner's application, but that in fact this might constitute a reason for the board refusing to allow "any addition to such number." For other filling station cases refusing applications for an additional filling station on the ground of hazards to traffic and peril from inflammable materials on the premises, see Olp v. Town of Brighton, 173 Misc. 1079; 19 N. Y. Supp. 2d 546 (1940), affirmed in 29 N. Y. Supp. 2d 956; McKinney v. City of Little Rock, 201 Ark. 618, 146 S. W. 2d 167 (1941); Dadukian v. Zoning Board of Appeals, 135 Conn. 706, 68 Atl. 2d 123 (1949).

58 Am. Jur., Zoning, Sections 192 and 193, say: "The general rule is that the mere fact that, without more, city officials fail to enforce a zoning ordinance against a violator does not estop the city from subsequently enforcing it against him. * * *

"It is ordinarily regarded as no justification to the violation of a zoning ordinance that the municipal officials have failed to enforce it against other violators. * * * "

The annotation in 119 A. L. R., 1509, 1517, states: "It has been held almost uniformly that the mere fact that some persons have been permitted to violate a zoning or fire limit regulation does not preclude its enforcement against another."

In support of this principle A. L. R. cites many cases from Georgia, Kentucky, Louisiana, New York, Oklahoma, Pennsylvania and West Virginia.

■■ ■ Considering these precedents and authorities, and the principles of judicial review of zoning actions set forth in Holcomb v. City of Clarksdale, we are of the opinion that appellee failed to meet his burden of proof of showing by clear and convincing evidence that the ac-

tion of the Mayor and Board of Aldermen of the City of Tupelo is arbitrary, discriminating and unreasonable. It is manifest that the intersection of Main and Park Streets, and that to the east of Main and Gloster Streets in Tupelo, together with the diagonal crossing at the latter point of the railroad, presents to the governing authorities of the city a serious traffic problem. Certainly we can say that the denial of appellee's petition for a special permit and exception to the zoning ordinance is fairly debatable and has a reasonable probable basis in the evidence. ■■■ The courts should not constitute themselves as a zoning board for municipalities. That primary must be in the city authorities.

Mayor Ballard admitted, at one point on cross-examination, that he had stated he would refuse appellee a permit because he did not want any Sunday operations. He had reference to the sale of groceries at the store and filling station of one Walton, a son-in-law of the appellee, and the fact that he intended to let another son-in-law, Helms, operate the one in question. However, he and two aldermen also testified, and the record shows, that the location in question presented a serious traffic problem. Chief of Police Monaghan testified that he did not think a filling station would present any more traffic problem than a grocery store. But these items of testimony must be considered along with the entire record. It demonstrates clearly that the construction of an additional filling station at this point would add to the tremendous traffic hazards and congestion in this immediate area, and that, at least, the city authorities were not acting without reason or any substantial basis of fact in denying appellee's petition for a permit.

Hence it follows that the chancery court was in error in declaring the 1946 ordinance invalid and enjoining appellants from proceedings under it.

We do not pass on the validity or invalidity of the 1932 and 1936 ordinances. They were not dealt with

by the chancellor in his opinion and decision nor were the facts in regard to the method and procedure of their adoption fully developed in this record.

 Moreover, the photostatic copies of the minutes and ordinances of the Mayor and Board of Aldermen are for the most part so dim that they are not legible, and they were sent here loosely arranged, and the pages are not in numerical order but loosely stacked one page on another and unbound. However, one of the Judges was able to piece together legible pages of the ordinance of 1946. Photostatic copies of records and documents should not be mailed here by the local clerks unless the copies are plainly legible and properly arranged. It appears that it would be difficult to read enough of the wording of the minutes and ordinances of 1932 and 1936 as photostated to determine whether they are valid ordinances or not.

We merely affirm the action of the chancellor in holding that the 1953 ordinance was void, but we think that the 1946 ordinance was valid and enforceable.

 It appears from the cost bill that there is included in the clerk's cost items not properly chargeable. For this reason appellee is granted leave to file a motion to retax the costs within sixty days from the date of final judgment. Neshoba County Gin Association, A. A. L., Inc. v. Johnson, 87 So. 2d 68, 87 So. 2d 927; Conn v. State, 97 So. 2d 923.

Affirmed in part and reversed in part; and judgment rendered here for the appellants as to the validity of the 1946 ordinance.

All Justices concur, except Justices *Hall, Lee* and *Holmes,* who dissent.

HALL, Justice, Dissenting:

I respectfully dissent from the holding in the controlling opinion in this case. The majority has decided, and correctly so, that the 1953 ordinance of the City of Tupelo

was void, but has held, as I see it, incorrectly, that the 1946 ordinance was valid and enforceable.

I appreciate the fact and fully realize that the municipality has the right to enact a zoning law and that the courts will not interfere with the determination of the city authorities as to the administration of that law "unless the court can say that their action was unreasonable and arbitrary", as was held in Jones v. City of Hattiesburg, 207 Miss. 491, 495, 42 So. 2d 717.

In that case we cited the case of Bradley v. City of Jackson, 153 Miss. 136, 119 So. 811, 816, wherein it was held that "All such ordinances and regulations, however, must be reasonable, otherwise they will be void and nonenforceable; and the question of their reasonableness is a judicial question." The same thing was held by this Court in the recent case of City of Hattiesburg, et al. v. Pittman, 102 So. 2d 352, not yet reported in the State Reports.

The question in this case boils itself down to whether or not the city authorities of Tupelo have been making an unreasonable and arbitrary application of the city zoning ordinance, but the majority opinion undertakes to show the validity of the 1946 ordinance. That ordinance referred to a zoning map of the City and the chancellor below had this map before him and found as a fact, which fact fully appears from the record in this case, that the 1946 map is not made in accordance with the provisions of the ordinance, and when the majority opinion talks about the validity of the 1946 map it completely overlooks the fact that the map does not correspond to the ordinance itself. Furthermore, under the law, the map is supposed to reflect a comprehensive plan for zoning for the entire city. In this case the city limits had recently been extended and a large additional amount of territory had been brought therein which, according to the map, was left entirely unzoned, and the map, therefore, did not furnish any comprehensive plan of zoning.

Another fact, which is barely mentioned in the controlling opinion, is that the record shows without conflict that the Mayor of Tupelo had a personal grudge against the appellee and personally made an affidavit against him every day that the appellee had some gasoline pumps in front of his newly constructed grocery store, even though at that time the pumps, which are operated by electricity, had never had any electricity connected to them and the appellee at that time was not operating a filling station. The writer cannot tell from the record before us exactly how many of said prosecutions there were, but the prosecutions got so regular that the appellee personally had taken down and transcribed a record of the testimony in ten of these cases and that record is before the Court showing ten successive prosecutions. As a matter of fact the appellee had not violated the zoning ordinance at that time.

Under a permit from the City he had torn down an old frame building located adjacent to the street and had constructed a concrete block and brick veneer building for his grocery store, in lieu thereof, but had set the same back a considerable distance from the street and had left parking areas all around, so that customers would not have to park on the street and obstruct traffic but could drive into his place and park there. After this was done he set up some gasoline pumps in one of the vacant areas in front, a considerable distance from the street and immediately the Mayor started prosecuting him. It is significant to note that according to the record the appellee repeatedly made demand to know under what ordinance he was being prosecuted, that is whether the 1932 ordinance, the 1936 ordinance, the 1946 ordinance or the 1953 ordinance. On many of these prosecutions he was never advised which ordinance the affidavit was made under, and on some of them he was told that it was under the 1953 ordinance which the Court is unanimously of the opinion was void.

In 58 Am. Jur., p. 953, Zoning, Section 21, it is said: "In considering the validity of zoning laws, the courts must determine whether they are arbitrary or unreasonable in their conception *or application,* since the zoning power does not extend to unreasonable or arbitrary intermeddling with the private ownership of property. Accordingly, there are a number of cases in which particular zoning restrictions have been regarded as unreasonable, arbitrary, or oppressive." (Emphasis supplied.) Numerous authorities are cited in the notes supporting this proposition, including dozens of cases and annotations from American Law Reports.

In 58 Am. Jur., p. 954, Zoning, Section 22, it is said: "In determining the question of the reasonableness of a zoning restriction, the courts will disregard mere form in order to insure protection of rights injuriously affected by unreasonable and arbitrary action. In this respect, it is worthy of emphasis that although zoning ordinances are not per se invalid, yet when the provisions of such an ordinance come to be applied to particular premises, or to particular conditions, or to be considered in connection with specific complaints, some of them may be found to be greatly arbitrary and unreasonable. Hence, the determination of reasonableness of zoning restrictions must be made in the light of facts presented in each case. The fact that substantial study has been given to the problem of a municipal zoning ordinance before its enactment has been regarded as a matter properly considered in determining its reasonableness." In the notes under this section there are numerous authorities cited, including annotations in American Law Reports.

Now let us see whether or not the enforcement of any of these ordinances against the appellee was unreasonable, arbitrary, or capricious. Mayor Ballard himself testified that the reason he voted to deny the permit in this case was that the appellee had a son-in-law far removed from the place in question in another section of

the City of Tupelo who was operating both a grocery store and a filling station and was using the filling station only as a blind to keep his grocery store open for the sale of goods on Sunday. That was the only reason for the Mayor's being opposed to the granting of the permit. He did not claim to be considering the question of safety, morals, public health or public interest in reaching his decision.

This case was tried at the September 1956 Term and both sides rested and the matter was argued to the chancellor, and the chancellor took the matter under advisement for a decision in vacation. Later, the map which was referred to and adopted by the 1946 ordinance was found and thereupon a motion was made to reopen the case so that this map might be introduced. The motion was sustained and the case reopened and additional proof taken at the January 1957 Term. It was then for the first time that the City introduced two Aldermen who testified that they voted against the permit because they thought it would create a traffic hazard. They were not traffic experts and had had little, if anything, to do with traffic problems, but the Chief of Police, who is constantly confronted with traffic problems, testified that in his opinion the use of this property as a filling station site would not in any manner create a traffic hazard. In fact, the appellee's lot measures 105 feet by 125 feet. The old frame building extended right up to the edge of the street, but the new building is set back with ample parking space on all sides and ample room for the operation of a gasoline filling station, and it seems to the writer that with all of this additional parking space available cars would no longer have to park on the street but could get completely out of the street and out of the way of all traffic. In fact, the question of a traffic hazard was not even raised on the original trial of this case but came up purely as an afterthought when the case was reopened.

As stated in the controlling opinion, the 1946 map and all of the notations, references and other things shown thereon, were as much a part of the ordinance as if the matters and things set forth in the map were all fully described therein. As I have pointed out, the ordinance itself is directly in conflict with the zoning map. In such instance, what is a citizen to do? Is he to disregard the zoning map and follow the ordinance or vice versa?

It is ludicrous to read in the opinion that after the 1953 zoning ordinance the 1946 zoning map was filed away, but the opinion of the majority wholly fails to state where it was filed. For months and months the City Building Inspector searched for the map and was unable to find it. It was not on file in the Mayor's Office or in any other place where it was available for inspection but was stored away in the basement of the City Hall, along with a lot of other useless rubbish, and, as I have heretofore stated, when the map was finally found, after this case had been tried at the September Term and both sides had rested and the case was under advisement in the hands of the chancellor, the City Building Inspector placed the map in the Mayor's Office. When the map was found, it is true that it was in an unexpected place, to wit, amongst a lot of rubbish down in the basement, but it was not in the Mayor's Office, as the controlling opinion states.

The controlling opinion states as a fact that the appellee was not misled in any respect as to the classification of the zone in which his property was located, to wit, "local business zone", but I maintain that when the 1946 ordinance made the map a part of the ordinance, and it was in conflict with the ordinance, there was no way for him to know that his property was zoned for local business.

Another thing of which nothing is said in the controlling opinion is that the ordinance in question prohibited the operation of gasoline filling stations anywhere in the

City except industrial areas, but as a matter of fact there were five gasoline filling stations almost within speaking distance of the location in question and there were others scattered at intervals all up and down Main Street and elsewhere throughout the City. So far as the fire hazard is concerned, if any there be, the present method of operating gasoline filling stations is such that there is substantially no fire hazard whatsoever and a check of the records of the city fire department in practically every city will show that there are very few calls of the fire department to gasoline filling stations. The chancellor held, and I think he was eminently correct, that a provision restricting filling stations to industrial areas when there are already many located in other areas was arbitrary and discriminatory in violation of appellee's constitutional rights, and, as stated by the chancellor, that its actual effect would be to keep out competition for those filling stations located in other areas. In fact, the Mayor testified that in his opinion gasoline filling stations are prohibited under all of the City's zoning laws of Tupelo. It requires no citation of authorities to show that such a legitimate business cannot be absolutely prohibited by a city.

For the reasons which I have undertaken to set out as briefly as possible, I think the decision of the majority overruling the chancellor's findings is erroneous and I respectfully dissent therefrom.

Mention is made in the opinion about the shape of the record in this case, particularly the photostatic copies of the exhibits consisting of minute books and the ordinance book of the City of Tupelo. These photostatic copies are directly in conflict with our rules, and in the first place should not have been sent up here, but since they were sent they should not have been just a bunch of loosely assembled pages but should have been copied by typewriter on white paper with black record ink. Some of these photostatic copies are so dim that it would prac-

tically ruin the eyesight of anybody to undertake to read them, and if we had a rule which permitted them, they would have to be clear copies to be of any value to us. Furthermore, they should have been bound.

It is evident from the fee bill that the clerk entered a charge of 25¢ per hundred words for all of this photostatic work.

There are two exhibits consisting of testimony in the trial of the appellee in the City Court. One is ninety-four pages in length and the other is fourteen pages in length. This testimony was evidently taken down by court reporters who were personally hired and paid for by appellee.

The clerk has placed in the record a fee bill for copying four hundred and fifty-five pages, 84,680 words, at 25¢ per hundred, $211.70. This is in addition to the fee to the court reporter and the amount of this charge is so patently excessive to the writer as to almost amount to extortion. The cost of this case should be reapportioned to correspond with the true facts as to how many pages and how many words the clerk copied. Attorneys in the chancery clerk's home town are very reluctant to raise any objection to one of his fee bills, but the abuse in this case is so flagrant that we feel it is our duty to call attention to it.

*Lee* and *Holmes, JJ.,* concur in this dissent.